UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 11 |
| ISAACSON STEEL, INC. | ) No. 11-12415-JMD |
| ISAACSON STRUCTURAL STEEL, INC. | ) No. 11-12416-JMD |
| Debtors. | ) |
| | ) Jointly Administered |
| | ) |

## GLOBAL COMPROMISE AND SETTLEMENT DISCLOSURE SUPPLEMENT

Pursuant to the Bench Order made by the United States Bankruptcy Court for the District of New Hampshire (the "Court") on the Joint Motion for Interim Protective Order and Final Order Approving Global Settlement Agreement filed by the Settling Parties[1] (the "Settlement Motion," "Settlement" and "Settling Parties"), the Debtor in Possession, Isaacson Structural Steel, Inc. and its affiliate, Isaacson Steel, Inc. ("Structural" and "Steel" and, together, the "Debtor") joined by the other Settling Parties submit this Disclosure Supplement to the Bankruptcy Court and creditors entitled to notice of the proposed Settlement pursuant to F.R.B.P. 2002 for the purpose of providing them with further information regarding the proposed Settlement and its expected effect on them.

**A.** **Purpose of Disclosure.** The purpose of this Disclosure is to permit creditors and other interested parties in interest to make an informed decision regarding the merits of the proposed Global Settlement Agreement (the "Settlement"), a copy of which is attached as Exhibit A. A copy of the Liquidating Trust Agreement (the "Liquidating Trust") contemplated by the Settlement is attached as Exhibit B. The Settlement contemplates a Plan of reorganization based on the agreement (the "Plan"), which Debtor will file as soon as practicable. Except as otherwise defined herein, all words, terms and phrases defined in the Settlement shall have and shall be given the same meaning when used herein.

**B.** **Settlement Summary.** During the first hearing on the Settlement, the Court

---

[1] "Settling Parties" means the Debtors, the Official Committee of Unsecured Creditors (the "Committee"), Passumpsic Savings Bank ("Passumpsic" or "PSB"), the New Hampshire Business Finance Authority (the

fairly described the Settlement and the Trust as a lottery ticket because it is based on the successful litigation of the Causes of Action to be placed in the Trust.  The Settlement is premised on the recovery and liquidation of the assets that constitute substantially all of the remaining assets of the Debtor, by recoveries from bankruptcy actions (the "Chapter 5 Actions") and other actions (the "Other Actions") by the Debtor's bankruptcy estates (the "Estate") and various negligence/negligent misrepresentation claims against Debtor's directors and officers (the "D&O Claims").  The Settlement is intended to:

1.      Pay most or all of the Professional Administrative Claims, which have been significantly compromised by the Professionals as part of the Settlement, and provide for the payment of the expected, but disputable $520,000 Massachusetts Sales Tax in full and resolves the Turner Administrative Claim, which would otherwise be insolvent.

2.      Create a pool of funds for Unsecured Creditors[2] (the "Unsecured Creditor Gift Pool") through a series of deep compromises and "carveouts" or "gifts" from creditors with a priority of distribution senior to the Priority Creditors and all of the  Non-priority Unsecured Creditors[3]

3.      Maximize the potential distribution to Debtor's creditors by preventing the significant delay, expense, and questionable recovery that would result from litigation among the Settling Parties over their respective rights, title and interests in and to the Errors and Omissions Policy owned by David J. Driscoll and D.J. Driscoll & Company, PLLC (collectively, "Driscoll" and the "Driscoll EO Policy") and the Directors and Officers Liability Policy purchased and owned by the Debtor (the "DO Policy") and the proceeds thereof (the "EO Proceeds" and the "DO Proceeds"). Absent the approval of the Settlement, it is unlikely that the holders of priority and non-priority unsecured claims will receive anything on account of their claims, because, as is demonstrated by the following chart, the claims of parties who hold senior rights of distribution to the Debtors' assets exceed the value of those assets:

---

"BFA") and Turner Construction, Inc. ("Turner").

[2] "Unsecured Creditors" means the Debtor's Non-priority Unsecured Creditors, excluding PSB, Turner, Griffin  and his wife, Hanson and his wife, and affiliates of the Debtors.

[3] Under *SPM Manufacturing Corporation*, 984 F.2d 1305 (1st Cir. 1993), the Settling Parties have the right to gift parts of dividends paid or payable to them to the Trade Creditors, particularly where the gift does not obligate the benefitted creditors to vote in favor of the Plan.  The Settlement does not require Trade Creditors to vote in favor of the Plan.  As a result, the Settlement does not violate the classification requirements of the Code.

**D&O Claims**

| | |
|---|---|
| Maximum Likely Value of D&O Claims | $   4,500,000 |
| | |
| Secured Claims | |
| BFA | $  (1,250,000) |
| Competing Claims | |
| PSB | $(10,000,000) |
| Inframetals Moriarity | $3,500,00 |
| | |
| Value Available to Unsecured Creditors | $  0 |

**Chapter 5 Causes of Action**

| | |
|---|---|
| Maximum Likely Value of Chapter 5 Causes of Action | $1,750,000 |
| | |
| Super-Priority Claims | $(1,000,000) |
| | |
| Administrative Claims | |
| Estate Professionals | $375,000[4] - |
| Turner | $(2,362,165) |

---

[4]  Assumes the BFA has been paid in full from the proceeds of the D&O Claims and that the Estate Professionals have been paid in full from distributions to super-priority claims.

| Massachusetts | $520,00 |
|---|---|
| Value Available to Unsecured Creditors | $ 0 |

### C.    Settlement Impact on Plan Confirmation and Certain Creditors.

**1.**    Upon Court approval of the Settlement, the Liquidating Trust will be established immediately by the execution of a document in substantially the form as that attached as <u>Exhibit B</u>.  PSB will then assign and transfer to the Liquidating Trust its D&O Claim,[5] which is currently scheduled for trial in October 2013, in exchange for a release of the Debtor's pending lawsuit against PSB.[6]  Debtor will assign to the Liquidating Trust (i) all of its D&O Claims,[7] (ii) the Chapter 5 Actions,[8] and (iii) its rights/claims against the Middletown School District and any other entities (together, the "Other Actions")[9] and (iv) all of its other property, exclusive of cash necessary to pay the Debtor's accountant and any federal income tax liability. BFA by way of reduction of its first priority secured claim in the proceeds of the DO Claims will assign and transfer to the Liquidating Trust $50,000 of recoveries that would otherwise be paid to BFA.[10]

**2.**    The Liquidating Trust will be the vehicle for prosecution of the Chapter 5 Causes of Action and the DO Claims.  It will be governed by three (3) trustees (the "Trustees"), as appointed by PSB, BFA, and the Committee, with decisions to be made by Majority Vote. The Trustees will employ Attorneys Peter G. Callaghan, George J. Marcus, and William S. Gannon to prosecute the litigation of the D&O Claims, and will employ Attorneys James LaMontagne and Peter Tamposi to continue to prosecute the Chapter 5 Actions.  The Trustees themselves will serve without compensation, but will be reimbursed for out-of-pocket costs incurred in their service on behalf of the Liquidating Trust.  Settlement of any of the D&O Claims

---

[5] *Passumpsic v. David Driscoll, Driscoll & Company, and Steve Griffin*: Cheshire County Superior Court; 215-2011-CV-00176.  with brief description.
[6] *Isaacson Structural Steel, Inc. v Passumpsic Savings Bank,* Adv. Proc 12-1200
with brief description.
[7] The 43 preference and other adversary proceedings filed in this Court, except for the one filed against PSB.
[8] Breach of subcontract for fabricated steel used in construction of Middletown, New York School.
[9] Breach of subcontract for fabricated steel used in construction of Middletown, New York School and the Hilton Hotel and overpayment to Debtor's subcontractor on St. Paul's School Project.
[10] The "Ending Cash" consists primarily of the proceeds of accounts receivable on hand when the Debtor ceased its business operations.  The proceeds belonged to PSB (pre-October 1, 2011) and BFA (October 1, 2011 and later).

or Chapter 5 Actions will be subject to Court approval, and all distributions from the Liquidating Trust will be as provided in the Plan.

3.    The Liquidating Trust will be executed and take effect upon Court approval of the Settlement, and the transfer of claims and rights, the dismissal of the Estate's claims against PSB, and the "waterfall" of distributions will be as described in the Settlement. Inasmuch as the Settling Parties together hold all secured claims and the bulk of the unsecured claims against the Estate, confirmation of the Plan on terms consistent with the Settlement is likely.  Creditors and other interested parties are cautioned that the Settlement is premised on significant net recoveries from the prosecution of the D&O Claims and the Chapter 5 Actions, and that, as set forth below, (i) absent such significant net recoveries, there will be little or nothing for distribution to unsecured creditors, and (ii) even in the best case scenario, it appears unlikely that there will be a significant recovery for unsecured creditors beyond the $300,000 "carve out" described in Paragraphs 8(c) and 8(d) of the Settlement.

4.    The Settlement of any of the D&O Claims or Chapter 5 Actions will also require prior Court approval.  On the other hand, the Trustees will be empowered to make distributions in accordance with the terms of the Settlement and Plan without further Court approval.

### D.    History of Case; Sale of Hard Assets.

The Debtor filed for Chapter 11 protection in June, 2011 due to cash flow difficulties. Efforts to obtain recapitalization as a going concern, or to find a going concern buyer to continue the Debtor's operations as a going-concern were unsuccessful, and Debtor ceased operations in early 2012.  Debtor thereafter sold its real property and substantially all of its remaining, tangible personal property to Counsel RB Capital, LLC, Myron Bowling Auctioneers, Inc. and Hilco Industrial, LLC for $2,400,000 (the "All Tangible Assets Sale").  Debtor disbursed the gross proceeds of the All Tangible Assets Sale in accordance with orders entered by the Court. As of April 2012, Debtor had no real or tangible personal property.

### E.    Remaining Property and Value Range.

1.    The Debtor will assign and transfer all of the Remaining Property to the Trust on or shortly after the date on which the Court approves the Settlement.  "Remaining Property" means the Debtor's (i) cash on hand and the approximately $50,000 to be made available by BFA pursuant to the Settlement (individually, the "BFA Cash" and, collectively with

the Debtor's cash on hand, the "Cash"), (ii) DO Claims, (iii) Chapter 5 Actions and other claims asserted therein, (iv) and the Other Actions.  The Debtor will retain enough Cash to pay Verdolino & Lowey (the "Debtor's Accountants") to prepare and file the Debtor's federal and state tax returns and the Debtor's tax liability, as estimated by the Debtor's Accountant.  After the Cash has been spent or transferred to the Trust, the Trust will assume the monthly cost of storing and maintaining the Debtor's business records and funding the prosecution of the Causes of Action.

        **2.**      Except for the cash on hand and the BFA Cash allocated to the Debtor by BFA and PSB, the Debtor has no assets other than the Causes of Action.  The Debtor has asserted approximately 43 Chapter 5 Actions claiming approximately $6,461,128.00 in total. The Debtor will not recover more than $1,750,000 on account of the Chapter 5 Actions (the "Chapter 5 Proceeds"), less an estimated cost projected to be 20% of the gross recovery.  From the Net Chapter 5 Proceeds, the Debtor will have to pay the $1,000,000 in Allowed Superpriority Claims and $375,000 in Allowed Professional Claims and any Quarterly Fees due the United States Trustee.

        **3.**      The Other Causes of Action range in value.  The Middletown Action arises out the contract to supply fabricated steel used in the construction of a school for the Middletown School District.  The Middletown Action is subject to the BFA Lien, but the Settlement transfers the net recoveries from the Middletown Action to the Liquidation Trust to fund the Litigation and pay distributions to allowed creditors.  The Debtor expects to recover $50,000 to $80,000 from the Middletown Action, less litigation costs and expenses.  Recovery from another pending claim, the Hilton Hotel Action, is uncertain, and cannot be quantified. Similarly, Other Actions arising from overpayments to subcontractors have been assigned little value because of the complexity of bond claims.

        **4.**      The wasting EO and DO Policies provide a maximum of $5,000,000 in coverage for the various claims asserted against Driscoll, Griffin and Hanson in the Driscoll, Inframetals and Moriarity Actions and those to be asserted against them by the Debtor. "Wasting" means that the amount of coverage provided by an insurance policy is reduced by "Defense Costs" paid by the insurer.  The Settling Parties do not know how much the insurers have already paid to the several law firms representing counsel to Driscoll, Griffin and Hanson, but assume that it is substantial.  The Settlement would minimize the further wasting of the EO and DO Policies, and would also enable the Estate, through the Liquidating Trust, to fund, if necessary, the significant expense of prosecuting the DO Claims to judgment.   Even if the

Settling Parties could value with reasonable certainty the DO Claims, they would not because it would adversely affect future settlement negotiations with the insurance carriers to the detriment of creditors.

  **5.**  PSB has filed an action against Driscoll and Griffin in which it seeks more than $10,000,000 in damages.  Inframetals for itself and as assignee of Moriarity has also filed DO Actions against Griffin and Griffin and Hanson.  Inframetals seems to claim approximately $3,400,000 in damages.  Assuming, as alleged by the insurers, that all of the losses resulted from a single occurrence, the Policies provide only $5,000,000 in coverage for claims totaling more than $15,000,000

  **6.**  If the total available insurance coverages is limited to $5,000,000, PSB, Inframetals and the Debtor are in direct competition with each other for a limited (and wasting) pool of DO Proceeds.  Although the Debtor does not believe that the Moriarity and Inframetals claims have merit, the coverage available to PSB and the Debtor will nonetheless be reduced by the Defense Costs incurred in those litigations even if it turns out that the DO Policy does not provide coverage.  Outside of the Settlement, the Proceeds of the Debtor's DO Claims may be $2,000,000 or less of which BFA would receive the first $1,250,000.

  **7.**  The Settlement increases the value of the DO Claims to the Estate and, more specifically, the Unsecured Creditors.  The contribution of the causes of action asserted against Driscoll and Griffin by PSB eliminates the competition between PSB and the Debtor.

  **F.**  **Remaining Claims Against or Competing with Estate.**  The claims against the Debtor total slightly more than $21,000,000 (the "Gross Total Claims").  The claims will be classified by the Code (the "Code Priorities") and Orders Affecting Distribution Priority:

  **1.**  The Allowed[11] Secured Claim held by BFA in the amount of $1,250,000, which is secured by a lien on the Debtor's Gross DO Proceeds.

  **2.**  Allowed Tier 1 Superpriority Claims held BFA, PSB and Turner in the total amount of $480,000.

  **3.**  Allowed Tier 2 Superpriority Claims held BFA, PSB and Turner in the total amount of $520,000.

---

[11] "Allowed" means that the claim has been approved by an order entered by the Court.

4.      Allowed Administrative Expense Claims held by the Debtor's Professionals in the total amount of $375,000, which will increase significantly to reflect services rendered after February 29, 2012, and the Turner Administrative Claim estimated to be approximately $2,362,165, which includes an expected, but disputable Mass. DoR Sales Tax Claim in an amount in excess of $520,000.

5.      Priority Tax Claims in the estimated amount of $173,828 based on filed Proofs of Claim.

6.      Unsecured Non-priority Claims in the estimated amount of $21,246,790.28, including insiders.

G.      **Distributions Under the Settlement**.  Under the Settlement, creditors will receive distributions from the proceeds of the Causes of Action as follows:

1.      BFA and PSB DO Proceeds Claims.  The proceeds of the DO Claims will first be used to pay the "reasonable and necessary attorneys' fees and related expenses" incurred in prosecuting the DO Claims, and thereafter will be paid pari passu to the BFA and PSB on account of their DO Claims.  The BFA Secured Claim of approximately $1,250,000 and a capped portion of PSB's separate claim to the DO Proceeds are expected to be less than the net recoveries made on DO Claims (the "Net DO Recoveries").  The funds remaining after payment of the capped BFA and PSB secured claims will be available for distribution to junior creditors and will be distributed by the Trustees in accordance with the Settlement and the Trust.  From its share of Net DO Recoveries, BFA will carveout and contribute $50,000 to the Trust (the "BFA Contribution").  PSB, in consideration of Debtor's dismissal of its adversary proceeding against PSB has significantly reduced its asserted secured claim in order to accomplish the Settlement.

2.      Tier 1 Superpriority Claims.  PSB, Turner, the Debtor's Professionals, and possibly BFA, hold Tier 1 Superpriority claims.  The Orders Affecting Distribution Priority grant BFA a $240,000 Superpriority Claim to the extent that it is not paid in full from the DO Proceeds.  The Orders also give PSB and Turner a $240,000 Superpriority Claim to be determined based on expenses paid as part of the "wind down" of the Debtor's business under the Liberty Mutual Assumption Order and allocated on a pari passu basis.  Under the Orders Affecting Distribution Priority, the Turner Superpriority and Administrative Priority Claims are subordinate to the Allowed Professionals Claims, which total more than $375,000 in unpaid Claims and may

increase.

3.    Tier 2 Superpriority Claims.   The Estate, PSB and Turner hold Tier 2 Superpriority claims.  The Estate holds an Allowed Tier 2 Superpriority Claim in the amount of $260,000 in its own right.  PSB and Turner hold an Allowed Tier 2 Superpriority Claim in the amount $260,000 to be shared on a pari passu basis subject to Allowed Professional Claims in the case of Turner.

4.    Administrative Expenses.   Included in the administrative claims against the Debtors are the administrative claim held by the Debtor's Professionals for unpaid fees, costs and expenses, which is at least $375,000, the disputed Turner Administrative Claim arising from the assumption of the Liberty Mutual Project in the alleged amount of $2,362,165, and the expected, but disputed Mass-DR Sales Tax Claim in excess of $520,000.  The other Settling Parties dispute the amount of the Turner Administrative Claim for a number of reasons, including the fact that in their opinion the Claim is limited to cost overruns that occurred after December 1, 2011, on which the Debtor assumed the Liberty Mutual Contract.  Turner disputes any such allegations.  The other Settling Parties also disputed the Mass-DoR Sales Tax Claim because the "sales" took place in New Hampshire.  In any event, Turner has agreed to reduce the realistic recovery on its administrative claim to up to $1,100,000, and has also agreed to pay the Mass DoR Tax Claim, in order to accomplish the Settlement.

5.    Unsecured Creditors.  The Unsecured Creditors are the only group of creditors that will be given better treatment than dictated by its Bankruptcy Code priority.  The other Settling Parties have agreed to permit the Unsecured Creditors to share in up to $300,000 on a pro rata or fractional basis.  Since the Unsecured Creditors Gift Pool will be funded by carveouts and gifts made by creditors holding senior priority, as permitted by *In re SPM Manufacturing*, the treatment of the Unsecured Creditors does not violate the Bankruptcy Code or the Orders Affecting Distribution Priority.

6.    Priority Tax Claims.  Among those creditors asserting priority tax claims are the Commonwealth of Massachusetts (other than those arising from the Liberty Mutual Project) and the States of Maine and Vermont.  Creditors holding Allowed Claims in this Class may receive a "lottery" Distribution, but the possibility is extremely remote.

7.    Non-priority Unsecured Claims.  Except for the Unsecured Creditors, creditors holding Allowed Non-priority Unsecured Claims may receive a "lottery" Distribution, but

the possibility is extremely remote.

        **8.**    <u>Insider Creditors</u>.  Insider creditors including Steel, Mr. and Mrs. Hanson, Mr. and Mrs. Griffin and their affiliates will not receive any Distribution.

        **9.**    <u>Equity Interests</u>.  The holders of equity interests in the Debtor's will not receive any distributions.

        **H.**    **Hypothetical Liquidation Summary.**

        If the Settlement should not be approved by the Court, the Settling Parties doubt that Administrative Claims would be paid in full.  It is extremely unlikely that Priority Tax and Non-priority Unsecured Creditors would receive any Distribution on account of their Allowed Claims in a liquidation or a Chapter 7 proceeding.  The Tables included in this Disclosure show that the expected disbursement of the proceeds of the Causes of Action.  The Debtor assumed an average Recovery Cost of 35% with respect to the DO Claims and 20% with respect to the other Causes of Action based on the experience and judgment of the Debtor's Professionals and the experienced attorneys retained by the Committee, PSB, BFA, Turner.  The Debtor also assumed that each of BFA, PSB, Turner and the Debtor would make every effort to maximize their own recovery in a liquidation in competition with each other causing substantially increased cost and expense.  In essence, the Exhibits show that in a liquidation scenario only BFA, PSB and Administrative Creditors would receive any Distributions.

        **I.**    **Best Interests of Creditors.**

        **1.**    The approval of the Settlement is in the best interests of creditors within the meaning of the Code.  "Best interests of creditors" generally means that all Impaired Creditors will receive pursuant to a Plan Distributions at least equal to the Distributions they would receive in a liquidation under Chapter 7.  This Best Interests Test compares the Distributions that Unsecured Creditors are expected to receive under the Settlement to the Distributions that non-priority unsecured creditors would receive through the hypothetical Liquidation.  For the reasons explained in the following Paragraphs, the Debtor expects that Unsecured Creditors will receive a meaningful distribution through the Settlement, and nothing in the event of a liquidation of the Debtors' assets under Chapter 7.

        **2.**    Unlike the mutually assured cost and expense destruction that would result from courthouse races and litigation among the Settling Parties, the Settlement permits

the Debtors and the other Settling Parties focus their time and resources on recovering money for creditors.

3.      The Settlement structure differs radically from the Code-imposed limitations that govern the disbursement of liquidation proceeds under Chapter 7. The Settling Parties agreed to cap, limit or reduce their claims as part of the Settlement despite the fact that they would not have to do so in a liquidation. PSB agreed to cap its recovery on account of its DO Claims at an amount far less than its $10,000,000 claims against Driscoll and Griffin in exchange for a release of the Causes of Action asserted against PSB by the Debtor against which it holds at least $9,000,000 in offsets. BFA agreed to cap its Allowed Secured Claim at the amount of principal and interest due as of the Court Settlement, except for expenses incurred in connection with the prosecution of the DO Claims. Turner agreed to cap its Allowed Superpriority and Administrative Priority Claims at a fraction of the amount asserted by Turner. To convince Turner to cap its Allowed Superpriority and Administrative Claims, the Professionals agreed to take the risk of sharing Distributions payable on account of their pre-Settlement Claims from Turner's share of Tier 1 and Tier Superpriority Claims with Turner instead of insisting on being paid in full first.

4.      The Settlement also results in Turner's paying the asserted Massachusetts administrative tax claim in an amount in excess of $520,000. Outside of the Settlement, the Debtor would have to incur substantial costs to dispute this administrative claim.

5.      Most importantly, the Settlement requires or results in BFA, PSB, Turner and the Professionals "carving-out" or "gifting" to Unsecured Creditors up to $300,000 (the "Minimum Trade Creditor Distribution") that they would never see in a liquidation under Chapter 7. The Settlement permits the Settling Parties to pass a portion of their recoveries through to the truly innocent Unsecured Creditors. The carveout gift could not be imposed on the Settling Parties.

J.      **Conclusion.** The Settlement represents the product of lengthy negotiations among the Debtor and the Committee, PSB, BFA and Turner based on the harsh realities of this Case, including the fact that there are $2,250,000 in Allowed Secured and Post-petition Superpriority Claims, at least $375,000 in Allowed Administrative Claims and more likely than not a significant part of the alleged Turner and Mass-DoR administrative claims totaling $2,362,165. The Settlement makes the Estate solvent by making provision for the payment of all of the administrative claims through the compromises embodied in it. By making the Debtor

and the Committee, BFA, PSB and Turner and the other Creditors Beneficiaries of the Trust, the Settlement creates a vehicle to maximize the value of the Trust Assets, including the non-debtor property contributed by Settling Parties, with as little cost, delay and waste as possible.

**Respectfully submitted,**

DATED:  August 30, 2013

/s/ William S. Gannon
William S. Gannon, BNH 01222 (NH)

Attorney for:

**Isaacson Structural Steel, Inc.** and **Isaacson Steel, Inc.**

WILLIAM S. GANNON PLLC
889 Elm Street, 4th Floor
Manchester NH  03101
PH: 603-621-0833

CERTIFICATE OF SERVICE

I hereby certify that on this date I served the foregoing pleading on each person named below by causing it to be filed electronically via the CM/ECF filing system or mailed by first-class United States Mail, postage pre-paid, or in such other manner as may be indicated:

All Persons on the attached Service Lists (if any).

DATED: August 30, 2013

/s/ Mary Ann Joyce
Jeanne Arquette-Koehler
Mary Ann Joyce

**COMBINED APPEARANCES SERVICE LIST**
**In Re: Isaacson Steel, Inc., Chapter 11, Case No. 11-12415-JMD**
**In Re: Isaacson Structural Steel, Inc., Chapter 11, Case No. 11-12416-JMD**

Ann Marie Dirsa - **ECF**
Assistant U.S. Trustee

Gregory Moffett – ECF
Joshua Menard – ECF
For Passumpsic Savings Bank

Edward C. Dial, Jr. – ECF
For Ford Motor Credit

Daniel Sklar – ECF
Holly Kilibarda – ECF
For Creditors' Committee

David Azarian – ECF
For American Aerial Services

David Anderson – ECF
Gayle P. Ehrlich - ECF
For Cate Street Capital

Christopher Allwarden – ECF
Honor Heath - ECF
For PSNH

Kristen Harris – ECF
Jonathan Starble - ECF
For Infra-Metals Co.

David Chenelle – ECF
For JM Coull, Inc.

Steven M. Notinger – ECF
For Steven Griffin

Joseph Foster – ECF
For The Eli L. Isaacson Family Trust

Richard Levine – ECF
Tobias Crawford - ECF
For Colby Company

John R.  Harrington – ECF
For Wells Fargo Equipment Finance

D. Ethan Jeffrey - ECF
Charles R. Bennett – ECF
Stephen Sutton - ECF
For Turner Construction

Justin Boothby – ECF

For Isaacson Structural Steel

Matthew Johnson - ECF
For Northway Bank

Gina Fonte – ECF
For The Richmond Group

Peter Hermes – ECF
For John Moriarty & Assoc.

Michey Long – ECF
For Prime Steel Erecting

George Marcus – ECF
For NH BFA

Rodney Stark – ECF
For D.J. Driscoll and Company

Lizabeth M. MacDonald - ECF
For City of Berlin

Mark Derby – ECF
For Presby Steel

David C. Green – ECF
For RBS Citizens

Geoffrey Coen – ECF
Paula-Lee Chambers - ECF
For Travelers Casualty

Robert Wexler - email

Internal Revenue Service
Special Procedures Function
80 Daniel
PO Box 9502
Portsmouth  NH  03802

Internal Revenue Service
Centralized Insolvency Operations
PO Box 7346
Philadelphia PA 19101-7346

State of New Hampshire
Dept. of Employment Security
Attn: Arnold Rocklin-Weare
32 South Main Street
Concord, NH 03301

## FULL CREDITOR SERVICE LIST
### In Re: Isaacson Structural Steel, Inc., Chapter 11, Case No. 11-12416-JMD

2747-2620 Quebec
239, ch.Lvoie
C.P. 218
Coaticook
Quebec  J1A 2T7 CANADA

3M
PO Box 844190
Dallas, TX 75284-4190

A.B.L. Golf Cars & Hydraulics
PO Box 729
Waterboro, ME 04087

Airgas East
27 Northwestern Drive
Salem, NH 03079

Airgas Safety
128 Wharton Road
Bristol, PA 19007-1693

Ajax Construction Co., Inc.
2833 Victory Highway
Harrisville, RI 02830

ALP Steel Corp.
PO Box 1085
Buffalo, NY 14220-8085

American Bolt & Nut
Company
PO Box 6119
Chelsea, MA 02150-0006

American Express Corporate
Card
PO Box 1270
Newark, NJ 07101-1270

American Steel Erectors
PO Box 185
Greenfield, NH 03047

Aquest Corporation
PO Box 777
Somers, CT 06071

Arc Electrostatic Painting Co.
PO Box 128
Auburn, NH 03032

Atlantic Machinery Sales, Inc.
#65 Route 125

Kingston, NH 03848

Barnes Distribution
1301 East 9th Street, Suite
700
Cleveland, OH 44114-1824

BECO Engineering Services,
MBE
340 Andrews Avenue
Johnson City, NY 13790

Berlin City Chevrolet
545 Main St.
Gorham, NH 03581

Berlin City Ford
191 Riverside Dr.
Portland, ME 04103-1039

Berlin Foundry & Machine
PO Box 127
Berlin, NH 03570

Berlin Spring, Inc.
PO Box 67
Berlin, NH 03570

Berlin Water Works
55 Willow Street
Berlin, NH 03570

Bernstein Shur
PO Box 9729
Portland, ME 04104-5029

BMW Financial
Customer Service Ctr.
PO Box 3608
Dublin, OH 43016-0306

Brentwood Machine Sales,
Inc.
313 State Route 125
Brentwood, NH 03833

Bret Steel Corporation
PO Box 1457
Dover, NH 03821-1457

Bruce Reichelt Enterprises
46895 SW LaChance Road
Grand Ronde, OR 97347

C.S.E. Inc.
PO Box 532
Williston, VT 05495

Carboline Company
350 Hanley Industrial Court
Saint Louis, MO 63144

Charles Leonard Const. Co.,
Inc. – to atty - ECF
183 Pembroke Road
Concord, NH 03301

Cigna Healthcare
500 Southborough Drive,
Suite 202
South Portland, ME 04106

City of Berlin – to atty - ECF
168 Main Street
Berlin, NH 03570

Clark's Machine Shop
PO Box 15
Clinton, ME 04927

Clean Rentals
PO Box 63070
New Bedford, MA 02746-
0899

CMC Joist & Deck
Dept 1049
PO Box 121049
Dallas, TX 75312-1049

Colby Company, LLC – to
atty - ECF
PO Box 1675
Portland, ME 04104

Combined Services LLC
15 North Main Street, Suite
300
Concord, NH 03301-4945

Computer Detailing, Inc.
2225 East Murray Holladay
Rd., Suite 220
Salt Lake City, UT 84117

Contour Steel
PO Box 7
Lake View, NY 14085-0007

Daniel Koury Construction Inc.
93 Gilbane St.
Warwick, RI 02886-6901

Daniel Marr & Son Co. – to atty - ECF
One D Street
Boston, MA 02127

David Payeur
50 Haven Avenue
Berlin, NH 03570

Dell
Dept 57 - 0002152292
PO Box 689020
Des Moines, IA 50368-9020

Deluxe Business Forms
PO Box 742572
Cincinnati, OH 45274-2572

Design Dasa
1501 Old Cheney Road
Box 2
Lincoln, NE 68512

DOWCO Consultants Ltd
2433 Holdom Ave
Burnaby, B.C.
Canada V5B 5A1

Duncan Galvanizing Corporation – to atty - ECF
69 Norman Street
Everett, MA 02149

East Shore Supply, Inc.
5 Old Bradley Street
East Haven, CT 06512-2344

Fastenal Company
PO Box 978
Winona, MN 55987-0978

Fed Ex
PO Box 371461
Pittsburgh, PA 15250-7461

Fleetpride, Inc.
PO Box 281811
Atlanta, GA 30384-1811

Fletch's Sandblassting & Painting, Inc.

52 Shirking Road
Epping, NH 03042

Fraser Molloy & Associates – to atty - ECF
PO Box 202
Lincoln, MA 01773-0202

Gexpro
PO Box 100275
Atlanta, GA 30384

Government Data Publications, Inc.
GDP Building (Accounting Div)
1661 McDonald Avenue
Brooklyn, NY 11230

Grainger
370 E. Industrial Dr.
Manchester, NH 03109-5310

Great American Leasing
PO Box 609
Cedar Rapids, IA 52406-0609

HarMac
PO Box 30135
Hartford, CT 06150

Haydon Bolts, Inc.
1181 Unity Street
Philadelphia, PA 19124-3196

Health Plans Inc.
1 Market Street, 3rd Floor
Portland, ME 04101

Hilti, Inc.
PO Box 382002
Pittsburgh, PA 15250-8002

Hyster Capital
PO Box 643749
Pittsburgh, PA 15264-3749

Infra Metals Corporation – to atty - ECF
8 Pent Highway
Wallingford, CT 06492

Irving Oil – to atty - ECF
PO Box 11013
Lewiston, ME 04243

James F. Stearns Co., Inc. – to atty - ECF
42 Winter Street
Pembroke, MA 02359

John W. Meyers
12 Remington Lane
Houston, TX 77005

Joseph P. Carrara & Sons, Inc.
2464 Case Street
Middlebury, VT 05753

K.L. Jack & Co., Inc.
145 Warren Street
Portland, ME 04103

KTA-TATOR, Inc.
115 Techn ology Srive
Pittsburgh, PA 15275

Lab Safety Supply
PO Box 5004
Janesville, WI 53547-5004

Lavonville, Inc.
504 Main Street
Gorham, NH 03581

Lamoureux's Auto Body Shop LLC
130A Wight Street
Berlin, NH 03570

Landscape Impressions
PO Box 345
Gorham, NH 03581

Leon Costello Company
1701 Riverside Drive
Berlin, NH 03570

Lexus Financial Services
PO Box 5855
Carol Stream, IL 60197-5855

Lifesavers, Inc.
39 Plymouth Street
Fairfield, NJ 07004

LT Software Solutions, Inc.
235 West Road, Suite 4
Portsmouth, NH 03801-5600

Lubker Distribution A Carrlu Co.

PO Box 1388
West Chester, PA 19380

Macsteel Service Centers
USA
385 West Hollis Street
Nashua, NH 03060

Mass Crane & Hoist
72 Progress Avenue
Tyngsboro, MA 01879

Massachusetts Dept of
Revenue
PO Box 7010
Boston, MA 02204

Mastermans
PO Box 411
Auburn, MA 01501-0411

McMaster-Carr Supply Co.
PO Box 7690
Chicago, IL 60680-7690

McNichols Co.
PO Box 101211
Atlanta, GA 30392-1211

Metals USA Plates and
Shapes – to atty – ECF
PO Box 827110
Philadelphia, PA 19182-7110

Milan Excavating
PO Box 299
Berlin, NH 03570

MMW Connection Design,
Inc.
PO Box 1128
Auburn, GA 30011

MMW, Inc.
PO Box 1128
Auburn, GA 30011

Motion Industries Inc.
1327 Main Street
Berlin, NH 03570

Mr. Auto
756 Third Avenue
Berlin, NH 03570

MSC Industrial Supply Co.,
Inc.

Dept. CH 0075
Palatine, IL 60055-0075

Munce's Konvenience
79 Pleasant Street
Berlin, NH 03570

Munce's Lubricants
PO Box 176
Gorham, NH 03581

Munce's Propane
620 Berlin-Gorham Road
Gorham, NH 03581

NADA Used Car Guide
Dept 266
Washington, DC 20042-0266

Nefco Corporation
PO Box 280186
East Hartford, CT 06128-
0186

NH Department of Safety
James Hayes Building
10 Hazen Drive
Concord, NH 03301

Northeast Doran
PO Box 1042
Skowhegan, ME 04976

Northern Community
Investment Corp.
51 Depot Square, Suite #2
Saint Johnsbury, VT 05819

Northway Bank – to atty -
ECF
3424 White Mtn Hwy.
North Conway, NH 03860

NY Tech Supply Co.
PO Box 180
La Fayette, NY 13084

O.B. Hill Trucking & Rigging
Co., Inc.
197 West Central Street
Natick, MA 01760

Oliver Stores
565 Main Street
Lancaster, NH 03584

P.J.A. Associates

350 State Street, Suite 200
Binghamton, NY 13901

P.S.E. Consulting, Inc. – to
atty – ECF
PO Box 374
North Billerica, MA 01862

Passumpsic Savings Bank –
to atty - ECF
497 Railroad St.
Saint Johnsbury, VT 05819-
0038

PC Connection Inc.
PO Box 4520
Woburn, MA 01888-4520

Peddinghaus Corporation
300 North Washington
Bradley, IL 60915

Perras Lumber Inc.
PO Box 129
Groveton, NH 03582

Platinum Plus for Business
PO Box 15710
Wilmington, DE 19886-5710

Precision Ladder, LLC
PO Box 2279
Morristown, TN 37816-2279

Professional Sports
Publications
350 Massachusetts Ave.,
Dept. 119
Arlington, MA 02474

R&B Wagner, Inc.
PO Box 423
Butler, WI 53007

Ram Drafting
350 Scott Street, Suite 206
St. Catherine
Ontario L2N 6T4  CANADA

Rays Electric
PO Box 597
Berlin, NH 03570

Red-D-Arc Inc.
1035 Millbury Street
Worcester, MA 01607-1494

Reliance Steel, Inc. and
Subsidiary
94 South Oak Circle
Colchester, VT 05446

Ritchie & Sons
195 Ballardvale Street
Wilmington, MA 01887

Rockingham Electric Supply
Co.
187 River Road
Newington, NH 03801

Ross Express
PO Box 8908
Penacook, NH 03303

Ruberto, Israel & Weiner,
P.C.
255 State Street 7th Floor
Boston, MA 02109

Sanel Auto Parts Co.
PO Box 504
Concord, NH 03302-0504

Shaw Communications
PO Box 250
Gorham, NH 03581

Sherwin-Williams
124 Glen Avenue
Berlin, NH 03570

Smith & Town Printers
42 Main Street
Berlin, NH 03570

South Jersey Energy
5429 Harding Highway,
Building 501
Mays Landing, NJ 08330

Spiller's Reprographics
PO Box 1638
Lewiston, ME 04241-1638

State of Maine Revenue
Services
24 State House Station

Augusta, ME 04333-0024

State of Vermont
133 State Street
Montpelier, VT 05633

State Permits
7049 Mears Gate Dr. NW
North Canton, OH 44720

Textile Waste Supply
Company
PO Box 290060
Charlestown, MA 02129-
0001

The Steel Supply Co., Inc.
35 Pine Drive
Cold Spring Harbor, NY
11724

Tnemec Company, Inc. - via
email
PO Box 843797
Dallas, TX 75284-3797
kovie@tnemec.com

Triad Metals International –
to atty - ECF
One Village Road
Horsham, PA 19044

Triangle Engineering
6 Industrial Way
Hanover, MA 02339-2425

Tribridge Holdings, LLC
Dept 369
PO Box 8000
Buffalo, NY 14267

Twinstate
291 Rand Hill Road
Morrisonville, NY 12962

~~United Industrial Services~~
~~PO Box 845033~~
~~Boston, MA 02284-5033~~

United Steel Erectors, Inc.
5471 Vt. 15

Wolcott, VT 05680

Universal Steel Erectors, Inc.
– to atty - ECF
149 Reservoir Drive
Weare, NH 03281

V&S Taunton Galvanizing,
LLC
585 John Hancock Road
Taunton, MA 02780

Vibra-Conn, Inc.
49 Center Street
Winsted, CT 06098-1656

Virginia Tidewater Group
International
5304 Larkins  Lair Court
Virginia Beach, VA 23464

Vulcraft of New York, Inc.
Lock Box 822562-312 Route
38
East Gate Drive
Moorestown, NJ 08057

W.B. Mason
PO Box 55840
Boston, MA 02205-5840

Wells Fargo – to atty - ECF
733 Marquette Ave, Suite
700
Minneapolis, MN 55402

White Mountain Lumber
PO Box 7
Berlin, NH 03570

Yankee Trucks
PO Box 11866
Concord, NH 03302-1866

Zep Manufacturing Company
PO Box 3338
Boston, MA 02241-3338



UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

IN RE:                                          )       Chapter 11
                                                )
ISAACSON STEEL, INC.,                           )       Case No. 11-12415-JMD
ISAACSON STRUCTURAL STEEL, INC.                 )       Case No. 11-12416-JMD
              Debtors                           )       Jointly Administered
                                                )

### GLOBAL SETTLEMENT AGREEMENT AND STIPULATION

After extensive negotiation, and so as to minimize ongoing expenses, litigation, and uncertainty and attempt to maximize recoveries for the Chapter 11 estates of the above-captioned Debtors (together, the **"Estate"**, and the Chapter 11 cases, the "Cases"), this *Global Settlement Agreement and Stipulation* (this "Agreement") is entered into by the Estate, the Official Committee of Unsecured Creditors of the Estate (the **"Committee"**), the NH Business Finance Authority (**"BFA"**), secured lender Passumpsic Savings Bank (together with and including its participating lenders, Woodsville Guaranty Savings Bank and Ledyard National Bank, **"PSB"**), and Turner Construction Company, Inc. (**"Turner"**), by and through their respective undersigned counsel.

Subject to and contingent upon the issuance of a final order by the Bankruptcy Court approving this Agreement (the **"Approval Order"**), the Estate, the Committee, BFA, PSB, and Turner (collectively, the **"Parties"**) do hereby stipulate and agree as follows:

**A.**   Prosecution of D&O Claims; Allocation of Recoveries.

1.   The pending and contemplated negligent misrepresentation and other claims against David Driscoll and Driscoll & Company (**"Driscoll"**), Steven Griffin (**"Griffin"**),

Page 1 of 12

Arnold Hanson ("Hanson"), and other officers, agents, and directors of the Debtors (collectively, the "D&O Claims"), are as follows:

**PSB Claim:** Passumpsic v. David Driscoll, Driscoll & Company, and Steve Griffin; Cheshire County Superior Court; 215-2011-CV-00176. Jury trial scheduled for 10/15/13.

**Infra Claim:** Infra Metals v. Hanson, Griffin; USDC NH 1:11-cv-00314-JL. Driscoll has been added as a third-party defendant. Discovery status and trial date are uncertain.

**Moriarty Claim:** Moriarty v. Hanson and Griffin: USDC MASS 1:12-dcv-10663. Discovery status and trial date are uncertain.

**Estate/Committee Claim:** Yet-to-be-filed claim by Estate against Griffin and/or Hanson and other officers and directors of the Debtors for breach of fiduciary duty, negligent misrepresentation, and other causes of action, in their capacities as officers and directors of the Debtors.

**Turner Claim:** In the event that Turner asserts a claim against the Debtor's former officers and directors for negligence, negligent misrepresentation or breach of their fiduciary duties, Turner shall assign such claims to the Trust (as defined below), upon the request of the Trustees, for no additional consideration. In the event that this covenant is breached, Turner acknowledges that the other Parties will have no adequate remedy at law and that this covenant is therefore specifically enforceable against Turner.

2. The Estate will cause the Estate Claim to be filed on or before August 10, 2013 and will seek to acquire the rights to and control both the Infra Claim and the Moriarty Claim as

soon as practicable.

3.    Upon entry of the Approval Order, the D&O Claims will be assigned to the liquidating trust (the "**Trust**") to be formed as part of and in contemplation of the Plan (as defined below) provided, however, that the assignment of the PSB D&O Claim to the Trust shall be rendered null and void if, prior to the entry of the Approval Order, the Debtors' cases are dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.  The Trust will be governed by a board of three trustees (the "**Trustees**") comprised of non-counsel designees of the Committee, PSB, and BFA, with each such party appointing one of the Trustees.  The D&O Claims will be diligently prosecuted by Peter Callaghan, as litigation counsel to PSB, William Gannon, and George Marcus or upon resignation of Mr. Gannon or Mr. Marcus, another litigation designee of the Trust (collectively, "**Prosecution Counsel**"), who will report to the Trustees. The Trustees will have final authority over the prosecution and any settlement or other resolution of the D&O Claims, provided that any settlement or other resolution of the D&O Claims: (i) shall, until a final decree has been entered in both of the Debtors' bankruptcy cases, be subject to the approval of the Bankruptcy Court; and (ii) after a final decree has been entered in both of the Debtors' bankruptcy cases, the Trustees shall not settle or otherwise resolve the D&O Claims without first providing to the Parties, or their successors in interest, ten (10) days' notice of and a reasonably detailed description of the proposed settlement or other resolution. All recoveries from the D&O Claims will be distributed in accordance with this Agreement.

4.    The claims against Driscoll are believed to be covered under Driscoll's $500,000 wasting professional liability insurance policy.  All of the D&O Claims are believed to be covered under ISSI's $4,500,000 wasting directors'/officers' insurance policy.

5.    As soon as practicable after execution of this Agreement, Prosecution Counsel or

their designees will initiate discussions and/or mediation with the D&O Claims insurers in an effort to resolve the D&O Claims, in their entirety, by settlement, in consultation with and subject to the approval of the Trustees. Provided that assignment of the PSB D&O Claim has not been rendered null and void by virtue of conversion or dismissal of the Cases prior to entry of the Approval Order,, the Recoveries from the D&O Claims (whether by settlement or by judgment) will be distributed as follows (whether such distribution is made available before or after confirmation of a plan(s) of reorganization for the Debtors:

(a)  First, to PSB, the BFA, and the Estate, subject to documentation and review by the Trust for reasonableness, as reimbursement for their respective actual, reasonable, and necessary attorneys' fees and related expenses incurred, subsequent to the Approval Order, in connection with the prosecution or any negotiation or settlement of the D&O Claims (collectively, the "**D&O Litigation Expenses**").[1]

(b)  Second, subject to documentation and review by the Trust for reasonableness, to PSB, in reimbursement of legal and expert expenses incurred by PSB prior to the Approval Order in connection with the D&O Claims, up to a maximum of $100,000.

(c)  Third, the remaining net recoveries will be divided equally between PSB and the BFA; provided that (i) PSB's share shall be capped at a maximum of $▓▓▓▓ and (ii) BFA's share shall be capped at the actual amount of its claim against the Estate (the "**BFA Claim**"), less $50,000 (the "**BFA Contribution**").

(d)  Fourth, any D&O Claim recoveries remaining after distributions pursuant to subparagraphs (a), (b) and (c) of this Paragraph 5 shall be paid over to the Trust for

---

[1]  D&O claim litigation fees/expenses of Marcus, Clegg & Mistretta, prior to the retention of George Marcus by the Trust will be included in the BFA Claim.

distribution in accordance with Paragraph 8 of this Agreement.

All recoveries due PSB under (a), (b), or (c) above or due BFA under (c) above will be paid directly to PSB and BFA, outside of the Estate or the Trust, and without any further order of the Court. In the event that recoveries on the D&O Claims are insufficient to pay the D&O Litigation Expenses or legal expense reimbursement as described in Paragraph 5(b) above, PSB, the BFA, and the Estate will be allowed administrative expense claims against the Estate *pari passu* with all other administrative claims, but junior to super-priority administrative claims under Paragraph 8 below, for the lesser of (i) the actual amount of such unpaid D&O Litigation Expenses and legal expense reimbursement or (ii) ███████ provided that PSB shall share in this allowed administrative expense claim only if the assignment of the PSB D&O Claim has not been rendered null and void.

**B.    Dismissal of Adversary Proceeding Against PSB; Mutual Releases.**

6.     Immediately after the entry of the Approval Order, the Trust (if it has been formed) and the Estate will dismiss the pending adversary proceedings against PSB (Adv. Cases 12-0100 [Doc #887] and 12-0101 [Doc. #888]), with prejudice (except as set forth in the proviso below), and PSB and the Trust (if it has been formed) and the Estate (for itself and on behalf of the Trust) and the Committee will promptly execute mutual releases, subject to the terms of this Agreement including the proviso below, releasing each other and their respective employees, officers, directors, trustees, agents, attorneys and assigns from all now-existing or hereafter-arising claims, known or unknown, arising from or in any way related to this matter, except that PSB will retain its rights as a general unsecured creditor up to a maximum amount of $7 million, and provided, however, that in the event that prior to entry of the Approval Order, the Debtors' cases are dismissed or converted to Chapter 7 cases and PSB's assignment of its D&O Claims is thereby

rendered null and void, then (i) neither the Debtors nor any trustee appointed for the Debtors nor PSB shall be barred from the prosecution of any claims by virtue of such mutual general release, (ii) the dismissal of the aforesaid adversary proceedings shall be deemed to have been done without prejudice, (iii) any statute of limitations or statute of repose governing any rights, claims, or defenses relating to the aforesaid claims or adversary proceedings shall be tolled, and (iv) the orders previously entered by the Bankruptcy Court with respect to the priority of the Parties' claims shall remain enforceable.

C.   Distribution of Estate Recoveries.

7.   The "Net Estate Recoveries" shall be comprised of the aggregate of (a) the Estate's Chapter 5 and other recoveries (including, without limitation, any , recovery from ███ ████████████████████ pursuant to Sections 547, 549, 550, and 551 of the Bankruptcy Code; provided, however that to the extent any such recovery (i) derives from a post-petition payment to ███ and (ii) such payment was on account of the project for the construction of the ████████ located at ████████████████████████ such recovery shall be paid to Turner, without reduction of any payments allocated to Turner under Section 8 of this Agreement), net of the Estate's Court-approved Chapter 5 and other claim prosecution/collection costs; (b) funds currently held by the Estate, excluding funds that constitute Ending Cash, as that term is defined in that certain *Joint Motion of Debtors and Debtors-In-Possession, The New Hampshire Business Finance Authority, And Turner Construction Company, Inc. to Approve Stipulation of Settlement*, filed on October 22, 2012 [Doc. # 895] and further excluding any funds that may be awarded to PSB or BFA from the so-called "Inventory Reserve" of $39,097, the so-called "Lunderville Note Reserve" or the Real Property Escrow of $60,000, all of which were the subject of an evidentiary hearing on November 27, 2012 and are referenced more particularly in the *Final Pretrial*

*Statement of New Hampshire Business Finance Authority with Respect to Evidentiary Hearing on the Allocation of the Debtor's and Ending Cash* [Doc. # 918] filed on November 21, 2012; provided, however, that BFA shall release to the Estate (aa) its interest in so much of the Ending Cash that constitutes the proceeds of the Middletown account receivable, so called, and (bb) $100,000 of Estate funds previously allocated by BFA for application to the Trust's D&O Litigation Expenses, provided that such funds are used for such purpose [See Doc # 895, § 9.a.v., and 12/12/2012 Order thereon (Doc # 935);  and (iii) the remaining D&O Claim recoveries, if any, paid to the Estate under Paragraph 5(c) above (provided however that nothing herein shall be construed as a release of BFA's superpriority claim for $240,000), less (iv) any payments due from the Estate to the U.S. Trustee .

      8.      Provided that assignment of the PSB D&O Claim has not been rendered null and void by virtue of conversion or dismissal of the Cases prior to entry of the Approval Order, the Net Estate Recoveries will be assigned to and administered by the Trust, assuming it has been formed, or by the Debtors or any successors to the Debtors (if the Trust has not been formed), as follows:

      (a)      <u>First, to the extent that any portion of Net Estate Recoveries consists of and includes funds that are made available by virtue of the BFA Contribution, that is, funds that are included in Net Estate Recoveries but would not be included therein *but for* the BFA Contribution ("BFA Contribution Funds"), then twenty-five percent of such funds shall be distributed to PSB, thirty-seven and one-half percent (37.5%) of such funds shall be distributed to Turner, and thirty-seven and one-half percent (37.5%) of such funds shall be distributed to Estate Professionals.</u>

      (b)      <u>Second</u>, in payment of super-priority administrative claims,  as follows:

Tier One:[2]  $240,000 to PSB, $120,000 to Turner, $120,000 to Estate Professionals;[3]

Tier Two:   $240,000 to PSB, $40,000 to Turner, $250,000 to Estate Professionals;

(c)      Third, in payment of (i) administrative claims held by Turner and, as a carve-out from Turner's administrative claim, (ii) allowed claims of general unsecured creditors, excluding PSB, Turner, and insiders (the "**Unsecured Creditors**"), with Turner receiving 82% of each dollar and the Unsecured Creditors receiving 18% of each dollar, until Turner has received (inclusive of payments received under Paragraph 8(a) above) a total of $1,100,000;

(d)      Fourth to the Unsecured Creditors, until the Unsecured Creditors have received (inclusive of amounts received under Paragraph 8(b) above) a total of $300,000;

(e)      Fifth, to BFA, in repayment of the BFA Contribution;

(f)      Sixth, a payment to PSB in an amount equal to twenty-five percent (25%) of the BFA Contribution Funds as described in subparagraph 8(a) above; and

(g)      Seventh, to the Committee, for payment of allowed claims of non-insider general unsecured creditors, including  PSB (collectively, the "**General Unsecureds**") and allowed claims of Turner, with 75% of each remaining dollar to be paid to the General Unsecureds and 25% of each remaining dollar to be paid to Turner on account of the Turner Administrative Claim (as defined below).

9.      The Parties agree to support the confirmation and consummation of a Chapter 11

---

[2]This distribution assumes that BFA has been paid in full (less the BFA Contribution) from the recoveries from the D&O Claims under Paragraph 5(c) above.  In the event that these recoveries are insufficient to pay the BFA Claim (less the BFA Contribution) in full, BFA will be entitled to payment of that insufficiency amount (up to a maximum of $240,000) from the distributions otherwise allocated to Turner and the Estate Professionals in Tier One.

[3]"**Estate Professionals**" shall mean any professional whose retention was approved by the Bankruptcy Court prior to April 4, 2012.

plan which incorporates the provisions of and is otherwise consistent with this Agreement (the "Plan"). The Parties will not pursue, propose, support, recommend or encourage (a) any plan other than the Plan, or (b) any other restructuring or reorganization for, or the liquidation of the Debtor (directly or indirectly) in Chapter 11.

10.     Turner shall have an allowed super-priority administrative claim in the amount of $160,000 ("Turner SP Claim") and an allowed administrative claim in the amount of $2,362,165 ("Turner Administrative Claim"), provided that (i) the distributions on account of the Turner SP Claim and the Turner Administrative Claim shall be as set forth in Paragraph 8, and (ii) the Turner Administrative Claim shall be reduced by the amount Turner receives on account of the Turner SP Claim.

11.     In consideration of the allowance of the Turner Administrative Claim and to the extent not already paid, Turner shall pay for the goods, services, and other claims, including allowed tax claims asserted by the Massachusetts Department of Revenue that comprise the Turner Administrative Claim; provided that, Turner shall have no obligation to pay for any of the foregoing that arise from or relate to any litigation by the Debtors under Chapter 5 of the Bankruptcy Code. The Debtors shall cooperate with Turner to verify and accomplish the payment of the foregoing amounts.

12.     Immediately after the entry of the Approval Order, the Trust (if it has been formed) and the Estate (for itself and on behalf of the Trust) will execute releases releasing BFA and Turner and their respective employees, officers, directors, trustees, agents, attorneys and assigns from all now-existing or hereafter-arising claims, known or unknown, arising from or in any way related to this matter, except for BFA's and Turner's respective obligations under this Agreement. This release shall not be construed as or cause a release by BFA and/or Turner of any claims they or

either of them may have against the Estate and any asset of the Estate, all of such claims being expressly reserved and to the extent provided in this Agreement, compromised, resolved, and settled by the payments made pursuant to this Agreement.

13.     Reservation of Rights. Except as specifically set forth in the Agreement, all of the Parties' respective rights, claims, and defenses against third parties are preserved, including, without limitation, Turner's rights, claims, and defenses against Infra and with respect to any warranties assigned to Turner by the Debtors.

14.     Entire Agreement. This Agreement constitutes the entire agreement of the parties, superseding all prior negotiations, discussions, representations, promises, and understandings with respect to the matters set forth herein.

15.     Confidentiality. Each party to this Agreement agrees that it and its representatives, attorneys or agents shall maintain as confidential and not transmit to third parties a copy of or any description of the terms of this Agreement unless otherwise directed by the Bankruptcy Court, provided, however, that (a) BFA may distribute a copy of this Agreement to Coastal Enterprises, Inc.("Coastal"), which provided to BFA the funds that BFA advanced to the Debtors, upon the agreement of Coastal to be bound by the confidentiality provisions contained herein, and (b) Turner may distribute a copy of this Agreement to Steadfast Insurance Company ("Steadfast"), upon the agreement of Steadfast to be bound by the confidentiality provisions contained herein.

16.     Cooperation. Each of the parties to this Agreement agrees to execute and deliver such further agreements, documents, certificates and instruments and to take such further actions as may be necessary or appropriate to effectuate the commitments and undertakings of the parties as set forth in this Agreement.

17.     The covenants and agreements contained in this Agreement will be binding upon, and inure to the benefit of, the Parties and each of their respective successors, including, but not limited to, any chapter 11 or chapter 7 trustee(s) for the Debtors' respective estates, and assigns.

18.     Counterparts.  This Agreement may be executed by each of the undersigned in separate counterparts, and shall take effect when counterparts have been signed by each of the undersigned.  Executed electronic versions of this Agreement and all counterparts shall be effective and enforceable as originals.

WHEREFORE, the undersigned counsel have each executed this Agreement, with full authority from their respective clients, intending to be bound hereby.

*[signatures on following page]*

Date: _____

ISAACSON STEEL, INC. and
ISAACSON STRUCTURAL STEEL, INC.
By Their Attorneys
WILLIAM S. GANNON, PLLC

By _____
    Its: _____

Date: _2 August 2013_

PASSUMPSIC SAVINGS BANK
    (together with participants Woodsville
    Guaranty Savings Bank and Ledyard
    National Bank)
By Their Attorneys
PRETI FLAHERTY BELIVEAU & PACHIOS,
PLLP

By _____
    Daniel P. Luker, Esq.
    BNH 1598

Date: _____

NH BUSINESS FINANCE AUTHORITY
By Its Attorneys
MARCUS, CLEGG & MISTRETTA, P.A.

By _____
    George J. Marcus, Esq.

Date: _Aug. 8, 2013_

ISSI/ISI OFFICIAL COMMITTEE OF
UNSECURED CREDITORS
By Its Attorneys
NIXON PEABODY LLP

By _____
    Daniel W. Sklar, Esq.

Date: _____

TURNER CONSTRUCTION COMPANY, INC.
By Its Attorneys
MURPHY & KING, PC

By _____
    D. Ethan Jeffery, Esq.



# LIQUIDATING TRUST AGREEMENT

This Liquidating Trust Agreement (the "Agreement"), dated as of September ___, 2013, is by and between Chapter 11 Debtors Isaacson Steel, Inc. and Isaacson Structural Steel, Inc. (combined the "**Estate**"), the Official Committee of Unsecured Creditors of the Estate (the "**Committee**"), the New Hampshire Business Finance Authority ("**BFA**"), Passumpsic Savings Bank (together with and including its participating lenders, Woodsville Guaranty Savings Bank and Ledyard National Bank, "**PSB**"), and Turner Construction Company, Inc. ("**Turner**") (together, the Estate, the Committee, BFA, PSB, and Turner are referred to in this Agreement as the "**Parties**"), and is created in order to establish a liquidating trust in connection with that certain Global Settlement Agreement, dated August___, 2013, by and between the Parties and submitted to the United States Bankruptcy Court for the District of New Hampshire (the "**Bankruptcy Court**" for approval) (said Global Services Agreement, as the same may be amended, modified or supplemented from time to time in accordance with the terms and provisions thereof and/or as modified supplemented, or amended by an order of the Bankruptcy Court, hereinafter referred to as the "**GSA**")[1].

## *WITNESSETH*

WHEREAS, the Estates are debtors-in-possession in proceedings currently pending under Chapter 11 of the United States Bankruptcy Code (the "Chapter 11 Case") in the Bankruptcy Court;

WHEREAS, the Committee was duly appointed by the United States Trustee for Region One in the Estate's Chapter 11 Case.

WHEREAS, BFA is the holder of post-petition secured and administrative claims, including superpriority administrative claims against the Estate, such claims arising by virtue of post petition loans made to the Estate, and pursuant to orders of the Bankruptcy Court entered in the Chapter 11 Case; and

WHEREAS PSB holds secured, administrative, including superpriority administrative, and unsecured claims against the Estate, such claims arising from security agreements with the Estates entered into prior to the commencement of the Estate's Chapter 11 Case, as well as post-petition agreements with the Estate, and pursuant to orders of the Bankruptcy Court entered in the Chapter 11 case; and

WHEREAS, Turner holds administrative, including super priority administrative claims against the Estate, arising from contracts entered into with the Estate, and pursuant to orders of the Bankruptcy Court entered in the Chapter 11 Case; and

WHEREAS, on or about August ___, 2013, the Parties entered into the GSA for the purpose of (a) settling and compromising conflicting claims among the parties to the

---

[1] Capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings ascribed to them in the GSA.

1

proceeds arising from the prosecution of certain claims against former officers and directors of the Estate (the "**D&O Claims**"), liability for which claims are or may be insured pursuant to Director and Officer liability insurance policies held by the Estate (the proceeds of such policies being referred to herein as the "**D&O Proceeds**"), and (b) settling and compromising certain disputes regarding the order and priority of distribution of proceeds of the prosecution of the D&O Claims and causes of action held by the Estate under Chapter 5 of the U.S. Bankruptcy Code (the "**Chapter 5 Causes of Action**"); and

WHEREAS, the Parties have filed a motion with the Bankruptcy Court seeking approval by that Court of the terms of the GSA, and such motion is pending for decision by the Bankruptcy Court as of the date of this Agreement; and

WHEREAS, pursuant to the GSA, all D&O Claims and all Chapter 5 Causes of Action are to be transferred to a Liquidating Trust which is to be created in accordance with the terms of the GSA, and which is to administer, prosecute, and distribute the proceeds of such D&O Claims and the Chapter 5 Causes of Action in accordance with the GSA and the terms of a Liquidating Trust to be created pursuant to the GSA; and

WHEREAS, the Liquidating Trust to be formed in accordance with the terms of the GSA and this Agreement will also continue to serve as a liquidating trust under and pursuant to a plan of reorganization to be proposed by the Estate in the Chapter 11 Case (the "**Plan**"); and

WHEREAS, the Parties, by this Agreement, wish to establish the Liquidating Trust called for by the GSA, to receive the transfer of the D&O Claims and the Chapter 5 Causes of Action and to administer, prosecute and distribute the proceeds thereof in accordance with the GSA, and upon confirmation of the Plan, in accordance with the Plan;

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements contained herein and in the GSA, the Parties agree as follows:

## <u>ARTICLE 1</u>
## ESTABLISHMENT OF THE LIQUIDATING TRUST

1.1 <u>Establishment of the Isaacson Steel Liquidating Trust and Appointment of the Liquidating Trustees.</u>

(a) The Parties hereby established a trust which shall be known as the "**Isaacson Steel Liquidating Trust**", which shall also be referred to herein as the "**Trust**" and which is established on behalf of and for the benefit of the Parties and the entities that they represent, respectively, all of whom shall be the beneficiaries of the Trust created hereby (the "**Beneficiaries**").

(b) There shall be three (3) trustees of the Trust.  Within ten (10) days following the entry of an order of the Bankruptcy Court approving the GSA, each of the

Committee, BFA, and PSB shall appoint one person to serve as a trustee of the Trust, and together the three persons so appointed shall constitute and shall be referred to herein as the Liquidating Trustees (together, the "**Liquidating Trustees**", and each a "**Liquidating Trustee**" or a "**Trustee**"), and they shall be the trustees of the Trust. Each Trustee and each successor trustee serving from time to time hereunder as a Liquidating Trustee shall have all the rights, powers and duties set forth herein.

1.2     Transfer of Assets and Rights to the Isaacson Steel Liquidating Trust and the Liquidating Trustees.

(a) Upon the entry of a final order of the Bankruptcy Court approving the GSA, and the appointment of the Liquidating Trustees, the Parties shall cause to be transferred, assigned and delivered to the Trust all of their right, title, and interest in and to the D&O Claims and the Chapter 5 Causes of Action (the "**Transfer**"). In addition, the Estate shall transfer to the Trust the sum of $_____ representing cash assets of the Estate derived from the prosecution by the Estate of Chapter 5 Causes of Action and other claims prior to the date of this Agreement (the "**Initial Cash Transfer**"). Each of such transfers shall be free and clear of all liens, claims, encumbrances and interests of any person or entity.

(b) Upon and after such Transfer, the Trustees shall administer, prosecute, liquidate and distribute the proceeds of the D&O Claims, and the Chapter 5 Causes of Action in accordance with the terms and conditions of this Agreement and the GSA.

(c) Upon and after such Transfer, the Parties shall (i) cause to be delivered to the Trustees any and all documents or other information in their possession, that is, or may be, useful in connection with the prosecution of the D&O Claims and the Chapter 5 Causes of Action (including those maintained in electronic format and original documents). and (ii) shall provide access at reasonable times and under reasonable conditions to the Trustees as to all employees or agents of the Parties with knowledge of matters relevant to the D&O Claims and the Chapter 5 Causes of Action.

1.3     Title to D&O Claims and Chapter 5 Causes of Action.

Upon the Transfer of the D&O Claims and the Chapter 5 Causes of Action, the Liquidating Trustees shall succeed to all of the Parties' right, title and interest in and to the D&O Claims and the Chapter 5 Causes of Action, and the Parties, separately or individually, shall have no any further interest in or with respect to the same.

1.4     Nature and Purpose of the Isaacson Steel Liquidating Trust.

(a) Purpose. The Isaacson Steel Liquidating Trust is organized and established as a trust pursuant to which the Liquidating Trustees, subject to the terms and conditions contained herein and in the GSA agree to (i) hold the assets of the Trust and dispose of the same in accordance with this Agreement, the GSA, the Plan and in accordance with Treasury Regulation Section 301.7701-4(d); and (ii) oversee and direct the expeditious

and orderly liquidation of the assets of the Trust and the distribution thereof in accordance with the GSA and the Plan.  Accordingly, the primary purpose of the Trust is to liquidate and distribute the assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to preserve or enhance the liquidation value of the assets of the Trust, and consistent with, the liquidating purpose of the Trust.

(b) <u>Actions of the Liquidating Trust</u>. The Liquidating Trustees, subject to the exercise of their reasonable business judgment, and on behalf of the Trust, shall, in an expeditious and orderly manner, liquidate and convert the D&O Claims and the Chapter 5 Causes of Actions to Cash, and make timely disbursements under this Agreement and the GSA.  The liquidation of the D&O Claims and the Chapter 5 Causes of Action and the distribution of the proceeds thereof, may be accomplished by the Liquidation Trustees, in the exercise of their sole judgment and discretion, and without the necessity of Bankruptcy Court approval, and through the prosecution, compromise and settlement, abandonment or dismissal of any or all claims, rights or causes of action, or otherwise. Without limiting the generality of the foregoing:

(i) All actions of the Trust shall be upon the consent, authorization and/or approval of the Liquidating Trustees acting by a majority vote of the Trustees. Such consent, authorization and/or approval by majority vote of the Liquidating Trustees shall be obtained in one or more meetings thereof duly noticed and held pursuant to this Agreement, or upon one or more written consents, authorizations and/or approvals executed by a majority of the Liquidating Trustees, and obtained in accordance with the terms of this Agreement.

(ii) A meeting of the Liquidating Trustees may be held at any location within the State of New Hampshire or by telephonic conference call in which all Trustees are invited to participate in the same conference call.  A meeting in person or by telephonic conference call may be called upon three (3) days written notice delivered by any Trustee to the other Trustees, which notice shall specify the time and place and/or dial in instructions for the meeting or conference call, as the case may be.  A Trustee may appear in person at any such meeting of the Trustees, or may participate by telephone in such meeting. A majority of the Trustees shall constitute a quorum of the Trustees, which shall be necessary for the conduct of any business at any such meeting.

(iii)  A Trustee may propose that any consent, authorization and/or approval be provided by written agreement of the Trustees.  Notice of any such proposed consent, authorization and/or approval shall be provided to the Trustees by any one or more Trustees by written notice, and specifying the consent, authorization and/or approval to be sought. After three days following the delivery of such notice, any such consent, approval or authorization shall be effective if executed by a majority of the Trustees.

(c)    Nothing in this Agreement requires the Liquidating Trustees to file any accounting or seek approval of any court with respect to the administration of the Trust,

or as a condition for managing any payment or distribution out of the assets of the Trust, provided that such payment or distribution is made in accordance with the provisions of this Agreement and the GSA.

(d)     Prosecutorial Discretion of Liquidating Trustees. The Liquidating Trustees shall have the absolute right to pursue, settle and compromise or not pursue any and all D&O Claims and/or Chapter 5 Causes of Action as they may, in their sole judgment, determine to be in the best interests of the Beneficiaries.  The Liquidating Trustees shall have no liability for the outcome of any such decision except for any damages caused by recklessness, gross negligence, willful misconduct, or knowing violation of law.

(e) Relationship. This Agreement is intended to create a trust and a trust relationship and to be governed and construed in all respects as a trust.  The Trust is not intended to be, and shall not be deemed to be or treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Liquidating Trustee or the Beneficiaries, or any of them, for any purpose be, or be deemed to be or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers.   The relationship of the Beneficiaries to the Liquidating Trustees shall be solely that of beneficiaries of a trust and shall not be deemed a principal or agency relationship, and the Beneficiaries' rights shall be limited to those conferred upon them by this Agreement.

1.5     Incorporation of GSA.

The GSA and the order of the Bankruptcy Court approving the same, are hereby incorporated into this Agreement and made a part hereof by this reference; provided, however, to the extent that there is conflict between the provisions of this Agreement, the provisions of the GSA, and/or such Order, the terms of such Order, and to the extent consistent therewith, the GSA shall govern.

1.6     Funding of the Trust.

(a) Initial Funding. The Trust shall be initially funded by the Initial Cash Transfer.

(b) Subsequent Funding. Thereafter, the Trust shall be funded by the proceeds from the liquidation of the D&O Claims and the Chapter 5 Causes of Action.

# ARTICLE 2
## ISAACSON STEEL LIQUIDATING TRUST INTERESTS

2.1    Interests Beneficial Only.

The ownership of a beneficial interest in the Trust shall not entitle any Beneficiary to any title in or to the assets of the Trust as such (which title shall be vested in the Liquidating Trustees) or to any right to call for a partition or division of the assets of the Trust or to require an accounting or give standing to direct the Liquidating Trustees to do or not to do any act or to institute any action or proceeding upon or with respect to the assets of the Trust, except as expressly provided in this Agreement or the GSA.

# ARTICLE 3
## THE LIQUIDATING TRUSTEES

3.1    Trust Proceeds.

All of the proceeds of the prosecution, compromise and settlement of D&O Claims and Chapter 5 Causes of Action shall be added to the assets of the Trust (the "Trust Proceeds") and held as a part thereof (and which title shall be vested in the Liquidating Trustees).

3.2    Payment of Trust Expenses.

(a) The Liquidating Trustees shall maintain a litigation expense fund (the "Litigation Expense Fund") and expend the assets of the Litigation Expense Fund (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Trust during its duration; (ii) to pay reasonable administrative costs (including but not limited to, the costs and expenses of the Liquidating Trustees (including reasonable fees, costs, and expenses of professionals employed by the Liquidating Trustees), any taxes imposed on the Trust or fees and expenses in connection with, arising out of or related to the D & O Claims and the Chapter 5 Causes of Action; and (iii) to satisfy other liabilities incurred or assumed by Trust (or to which the assets are otherwise subject) in accordance with this Agreement.

(b) The Liquidating Trustees may retain from the Trust Proceeds and add to the Litigation Expense Fund, at any time and from time to time, such amounts as the Liquidating Trustees deem reasonable and appropriate to ensure that the Litigation Expense Fund will be adequate to meet the expenses and liabilities described in this Section 3.2.

(c) Notwithstanding any other provision of this Agreement to the contrary, the Liquidating Trustees shall not be required to take any action or enter into or maintain any

6

claim, demand, action or proceeding relating to the Trust unless it shall have sufficient funds in the Litigation Expense Fund for that purpose.

3.3     Distributions.

The Liquidating Trustees shall distribute the net distributable assets of the Trust to the Parties and/or the Beneficiaries in accordance with the provisions of the GSA.

3.4     Tenure, Removal, and Replacement of the Liquidating Trustee.

(a)   Each Liquidating Trustee will serve until resignation and the appointment of a successor pursuant to subsection (b) below, disability or death (if applicable)).

(b)   A Liquidating Trustee may resign by giving not less than sixty (60) days' prior written notice to the remaining Liquidating Trustees. Such resignation will become effective on the later to occur of (i) the day specified in such notice and (ii) the appointment of a successor trustee as provided herein and the acceptance by such successor trustee of such appointment; provided, however, that if a successor trustee is not appointed or does not accept his or her appointment within sixty (60) days following delivery of notice of resignation, the resignation shall become effective on the 60th day following the delivery of notice of resignation.

(c)   In the event of a vacancy in any Trustee position, (whether by removal, resignation, disability, or death, if applicable), the vacancy will be filled by the Party who appointed the Trustee who has ceased service as Trustee.

(d)    Immediately upon the appointment of any successor trustee, all rights, powers, duties, authority, and privileges of the predecessor Liquidating Trustee will be vested in and undertaken by the successor trustee without any further act; and the successor trustee will not be liable personally for any act or omission of the predecessor Liquidating Trustee;

(e)    Upon the appointment of a successor trustee, the predecessor Liquidating Trustee (or the duly appointed legal representative of a deceased Liquidating Trustee) shall, if applicable, when requested in writing by the successor trustee, execute and deliver an instrument or instruments conveying and transferring to such successor trustee upon the trust herein expressed, without recourse to the predecessor Liquidating Trustee, all properties, rights, powers and trusts of such predecessor Liquidating Trustee, and shall duly assign, transfer, and deliver to such successor trustee all property and money held hereunder, and all other assets and documents relating to the Trust; and

3.5     Acceptance of Appointment by Successor Liquidating Trustee.

Any successor trustee appointed hereunder shall execute an instrument accepting such appointment and assuming all of the obligations of the predecessor Liquidating Trustee hereunder and thereupon the successor trustee shall, without any further act,

become vested with all the estates, properties, rights, powers, trusts, and duties of his or her predecessor in the Trust with like effect as if originally appointed as Liquidating Trustee.

3.6     Role of the Liquidating Trustees.

In furtherance of and consistent with the purpose of the Trust, the Liquidating Trustees, subject to the terms and conditions contained herein and in the Plan, shall have the power to (i) prosecute, compromise and settle, abandon or dismiss for the benefit of the Beneficiaries all claims, rights and causes of action transferred to the Liquidating Trustees and the Trust, including the D&O Claims and the Chapter 5 Causes of Action; and (ii) to otherwise perform the functions and take the actions provided or permitted in the GSA or in this Agreement.  In all circumstances, the Liquidating Trustees shall act in the best interests of all the Beneficiaries and in furtherance of the purpose of the Trust.

3.7     Authority of Liquidating Trustees.

Subject to any limitations contained herein (including, without limitation, Article 4 hereof) or in the Plan, the Liquidating Trustees shall have the following powers and authorities:

(a) hold legal title to any and all rights of the Trust, including, without limitation, collecting, receiving any and all money and other property belonging to the Trust;

(b) prosecute, compromise, settle, adjust, arbitrate, sue on or defend, pursue, abandon, exercise rights, powers, and privileges with respect to, or otherwise deal with and settle, in accordance with the terms set forth herein, all D&O Claims and all Chapter 5 Causes of Action or other causes of action in favor of the Trust;

(c) protect and enforce the Trust's rights of ownership to D&O Claims and Chapter 5 Causes of Action by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(d) obtain reasonable insurance coverage with respect to the liabilities and obligations of the Liquidating Trustees under this Agreement (in the form of an errors and omissions policy or otherwise);

(e) subject to the provisions of the GSA, select counsel and other professionals, who will be entitled to reasonable compensation for services rendered  upon such terms as the Liquidating Trustees, in their sole discretion, shall deem fair and reasonable;

(f) waive any privilege or any defense held by the Trust, on behalf of the Trust; and

(g) take or refrain from taking any and all other actions (apart from those listed above) that the Liquidating Trustees, in their sole discretion, deem necessary or convenient for the continuation, protection and maximization of the assets of the Trust and to carry out the purposes hereof; and

(h) make payments and distributions as contemplated by this Agreement, the Plan and the GSA.

3.8     Limitation of Liquidating Trustee's Authority.

Notwithstanding anything herein to the contrary, the Liquidating Trustees shall not, in their capacities as Liquidating Trustees, (i) be authorized to engage in any trade or business, (ii) take such actions inconsistent with the orderly liquidation of the assets of the Trust as are required or contemplated by applicable law, the GSA and this Agreement, or (iii) be authorized to engage in any investments or activities inconsistent with the treatment of the Trust as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d) and in accordance with Rev. Proc. 94-45, 1994-2 C.B. 684.

3.9     Books and Records.

(a) The Liquidating Trustees shall maintain books and records relating to the assets of the Trust and collections of the Trust and the payment of expenses of, and liabilities of claims against or assumed by, the Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof.  Such books and records shall be maintained on a cash or other comprehensive basis of accounting necessary to facilitate compliance with the tax reporting requirements of the Trust.

(b) The Parties and their duly authorized representatives shall have the right, upon reasonable prior written notice to the Liquidating Trustees, to inspect and, at the sole expense of the Party seeking the same, make copies of the books and records referenced in Section 3.9(a) on any business day and as often as may be reasonably be desired.

3.10     Inquiries into Trustee's Authority.

Except as otherwise set forth in this Agreement or in the GSA, no person dealing with the Trust shall be obligated to inquire into the authority of the Liquidating Trustees in connection with the protection, conservation or disposition of the assets of the Trust or the making of disbursements by the Trust.

3.11     Compliance with Laws.

Any and all distributions of assets of the Trust and proceeds of borrowings, if any, shall be in compliance with applicable laws, including, without limitation, applicable federal and state securities laws, and the provisions of the Bankruptcy Code.

3.12    Compensation of the Liquidating Trustee.

The Liquidating Trustees shall not be compensated for their service to the Trust. The Liquidating Trustees shall, however, be entitled to reimbursement for their reasonable out of pocket expenses incurred on behalf of the Trust.

3.13    Reliance by Liquidating Trustee.

Except as otherwise provided herein: (a) the Liquidating Trustee may rely, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by the Liquidating Trustee to be genuine and to have been signed or presented by the proper party or parties; and (b) persons dealing with the Liquidating Trustee shall look only to the assets of the Trust to satisfy any liability incurred by the Liquidating Trustee to such Person in carrying out the terms of this Agreement, and the Liquidating Trustee shall not have any personal obligation to satisfy any such liability.

3.14    Standard of Care: Exculpation.

(a) Neither the Liquidating Trustee nor any of his or her duly designated agents or representatives or professionals shall be liable for any act or omission taken or omitted to be taken by the Liquidating Trustee in good faith, other than acts or omissions resulting from the Liquidating Trustee's own gross negligence, recklessness, willful misconduct, knowing and material violation of law, or fraud.

(b) Neither the Liquidating Trustee nor any of his or her duly designated agents or representatives or professionals shall be liable to the debtor or any Beneficiaries for the impairment, waiver, lapse or bar of any Chapter 5 Causes of Action (including, without limitation, the expiration of the applicable statute of limitations or repose) related to a failure by the Liquidating Trustee to prosecute the Chapter 5 Causes of Action, unless the failure to prosecute the Chapter 5 Causes of Action was the result of gross negligence, recklessness, willful misconduct, or knowing violation of law.

(c) The Liquidating Trustee may, in connection with the performance of his or her functions, and in his or her sole and absolute discretion, consult with his or her attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons. Notwithstanding such authority, the Liquidating Trustee shall be under no obligation to consult with his or her attorneys, accountants, financial advisors or agents, and his or her good faith determination not to do so shall not result in the imposition of liability on the Liquidating Trustee, unless such determination is based on gross negligence, recklessness, willful misconduct, knowing and material violation of law, or fraud.

3.15    Conflicts of Interest.

If a Liquidating Trustee determines, in the exercise of his or her reasonable discretion, that he or she has a material conflict of interest with respect to the settlement, resolution or prosecution of the D&O Claims or the Chapter 5 Causes of Action, or any other matter (including, but not limited to, issues related to disbursements under the GSA), such Liquidating Trustee with the written approval of the party appointing him or her may select a designee to act on behalf of the Trust solely with respect to such matter (the "Designated Liquidating Trustee"), with such designee's authority to act on behalf of the Trust to terminate upon the matter's conclusion.

3.16    No Implied Obligations.

No covenants or obligations shall be implied into this Agreement, or the GSA. The Liquidating Trustees shall not be responsible in any manner whatsoever for the correctness of any recital, statement, representation, or warranty herein, or in any documents or instrument evidencing or otherwise constituting a part of the Liquidating Trust assets.

## ARTICLE 4
## TAX MATTERS

4.1    Federal Income Tax Reporting.

Subject to definitive guidance from the IRS or an order of the Bankruptcy Court or other court of competent jurisdiction to the contrary (including receipt by the Liquidating Trustees of a private letter ruling if the Liquidating Trustees so request one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustees, the Liquidating Trustees shall file returns for the Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and in accordance with this Article 4.

## ARTICLE 5
## INDEMNIFICATION

5.1    Indemnification of Liquidating Trustees and Others.

(a) To the fullest extent permitted by law, the Liquidating Trust, to the extent of its assets legally available for that purpose, shall indemnify and hold harmless the Liquidating Trustees and each of its respective officers, agents, employees, attorneys and other professionals (collectively, the "Indemnified Persons") from and against any and all losses, costs, damages, reasonable and documented out-of-pocket expenses (including, without limitation, fees and expenses of attorneys and other advisors and any court costs incurred by any Indemnified Person) or liability by reason of anything any Indemnified Person did, does, or refrains from doing for the business or affairs of the Trust, except to the extent that the loss, cost, damage, expense or liability resulted primarily from the

Indemnified Person's recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud.  To the extent reasonable, the Trust shall pay in advance or reimburse reasonable and documented out-of-pocket expenses (including advancing reasonable costs of defense) incurred by the Indemnified Person who is or is threatened to be named or made a defendant or a respondent in a proceeding concerning the business and affairs of the Trust.

(b) The fact that an act or omission of an Indemnified Person was based upon advice of counsel will conclusively be deemed not to constitute recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud.  Each Indemnified Person may rely, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties, and any order of the Bankruptcy Court.

(c) The Liquidating Trust may purchase indemnification insurance to satisfy any potential indemnification claims that may arise under this Section 5.1, in conjunction with any insurance obtained pursuant to Section 3.7(e), for the benefit of the Trust, the Liquidating Trustee, and any agents, representatives, attorneys, accountants, advisors or other professionals employed by any of them.

(d) The rights to indemnification under this Section 5.1 are not exclusive of other rights which any Indemnified Person may otherwise have at law or in equity, including without limitation common law rights to indemnification or contribution.  Nothing in this Article 5.1 will affect the rights or obligations of any person (or the limitations on those rights or obligations) under this Agreement, or any other agreement or instrument to which that Person is a party.


5.2    Limited Recourse.

No recourse shall ever be had, directly or indirectly, against a Liquidating Trustee personally, or against any employee, contractor, agent, attorney, accountant or other professional retained in accordance with the terms of this Agreement by the Liquidating Trustees, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Liquidating Trustees in implementation of this Agreement, or by reason of the creation of any indebtedness by the Trust for any purpose authorized by this Agreement, it being expressly understood and agreed that all such liabilities, covenants, and agreements of the Trust, whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Trust assets or such part thereof as shall under the term of any such agreement be liable therefore or shall be evidence only of a right of payment out of the Trust assets..

Notwithstanding the foregoing, a Liquidating Trustee may be held liable for his or her recklessness, gross negligence, willful misconduct, knowing and material violation of

law, or fraud, in each case, as determined by a final order of a court of competent jurisdiction not subject to appeal; and if liability on such grounds is established, recourse may be had against (a) the Liquidating Trustee's bond or applicable insurance coverage, and, (b) to the extent not covered by such bond or insurance, subject to Section 5.3, directly against the Liquidating Trustee, provided, however, in no event shall the liability of the Liquidating Trustee based upon recklessness or gross negligence be any more than the fees to which the Liquidating Trustee is entitled to hereunder that are paid to, or are received by way of set off or otherwise by, the Liquidating Trustee.

5.3     No Liability for Acts of Predecessor.

No successor Liquidating Trustee shall be in any way responsible or liable for the acts or omissions of any predecessor Liquidating Trustee in office prior to the date on which such person becomes the Liquidating Trustee, nor shall such successor Liquidating Trustee be obligated to inquire into the validity or propriety of any such act or omission unless such successor Liquidating Trustee expressly assumes such responsibility. Any successor Liquidating Trustee shall be entitled to accept as conclusive any final accounting and statement of Trust assets furnished to such successor Liquidating Trustee by the predecessor Liquidating Trustee and shall further be responsible only for those Trust assets properly includable in such statement.

5.4     Express Exculpatory Clauses in Instruments

As far as practicable, the Liquidating Trustee shall cause any written instrument creating an obligation of the Trust to include a reference to this Agreement and to provide that none of the Liquidating Trustees shall be liable thereunder and that the other parties to such instrument shall look solely to the Trust assets for the payment of any claim thereunder or the performance thereof; provided, however, that the omission of such provision from any such instrument shall not render any Liquidating Trustee liable nor shall a Liquidating Trustee be liable to anyone for such omission.

**ARTICLE 6**
**TERM; TERMINATION OF THE TRUST**

Term: Termination of the Trust.

(a) The Trust shall remain in existence until all Trust assets have been fully administered and distributed in accordance with this Agreement, the GSA, and to the extent applicable, the Plan, and a final report and accounting of the Liquidating Trustees shall have been issued to the Parties and accepted by the Parties, in writing.

(b) The Trust may be terminated prior to the occurrence of the events described in Section 6(a) only upon either (i) the express written agreement of the Parties, or (ii) a final order of the Bankruptcy Court terminating the Trust.

## ARTICLE 7
## AMENDMENT AND WAIVER

7.1    Amendment and Waiver.

(a) The Liquidating Trustees, acting unanimously, may (i) amend, supplement or waive any provision of this Agreement, without notice to or the consent of any Party, any Beneficiary or the approval of the Bankruptcy Court: (ii) cure any ambiguity, omission, defect or inconsistency in this Agreement provided, however, that no such amendment or cure shall adversely affect the U.S. federal income tax status of the Trust as a "liquidating trust".

## ARTICLE 8
## MISCELLANEOUS PROVISIONS

8.1    Intention of Parties to Establish the Trust.

This Agreement is intended to create a liquidating trust for federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a trust and any ambiguity herein shall be construed consistent herewith and, if necessary, this Agreement may be amended in accordance with Article 7 to comply with such federal income tax laws, which amendments may apply retroactively.

8.2    Laws as to Construction.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW HAMPSHIRE, WITHOUT REGARD TO WHETHER ANY CONFLICTS OF LAW WOULD REQUIRE THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION.

8.3    Dispute Resolution.

In the event of any unresolved dispute between and/or among the Liquidating Trustees, such dispute shall be resolved by the Bankruptcy Court upon motion made by any of the Liquidating Trustees, and after due notice and hearing by the Bankruptcy Court.

8.4    Severability.

If any provision of this Agreement or the application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

8.5    Notices.

All notices, requests or other communications to the parties hereto shall be in writing and shall be deemed to have been given or delivered upon (i) delivery of the notice in person; (ii) delivery by electronic mail or facsimile communication (as evidenced by a confirmed fax transmission report); (iii) the expiration of three days following deposit in the United States Mail, postage prepaid, restricted delivery; or (iv) the expiration of two (2) days after delivery to an overnight courier, such as Federal Express or United Parcel Service, with delivery pre-paid.  Until a change of address is communicated, as provided below, all notices, requests and other communications shall be sent to the parties at the following addresses or facsimile numbers:

If to the Estate:


With a copy to:


If to the BFA:


With a copy to:

George J. Marcus, Esq.
Marcus, Clegg & Mistretta, P.A.
One Canal Plaza, Suite 600
Portland, ME 04101
Tel: (207) 828-8000
Fax: (207) 773-3210
gjm@mcm-law.com


If to the Committee:

Daryll Bridges


With a copy to:

Daniel S. Sklar, Esq.
Nixon Peabody
900 Elm Street
Manchester, NH 03101
Tel: (603) 628-4000

15

Fax: (603) 628-4040
dsklar@nixonpeabody.com


If to PSB:

Passumpsic Savings Bank, Attn: Senior Loan Officer
497 Railroad St
PO Box 38
St Johnsbury VT 05819.


With a copy to:

Daniel P. Luker, Esq.
Preti Flaherty□
P.O. Box 1318
Concord, NH 03302-1318

If to Turner:


With a copy to

    Any party from time to time may change its address, facsimile number, or other information for the purpose of notices to that party by giving notice specifying such change to the other party hereto.

8.6    Fiscal Year.

    The fiscal year of the Trust shall be the calendar year, January 1 to December 31.

8.7    Headings.

    The section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

8.8    Counterparts.

    This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original instrument, but all together shall constitute one agreement.

8.9    Entire Agreement.

This Agreement (including the Recitals), constitutes the entire agreement by and among the parties hereto and there are no representations, warranties, covenants or obligations except as set forth herein or therein.  This Agreement supersedes all prior and contemporaneous agreements, understandings, negotiations, discussions, written or oral, of the parties hereto, relating to any transaction contemplated hereunder.  Except as otherwise specifically provided herein, nothing in this Agreement is intended or shall be construed to confer upon or to give any person other than the parties thereto and their respective heirs, administrators, executors, successors, or assigns any right to remedies under or by reason of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered on their behalf by their duly authorized agents, all as of the date first above written.

### [*signatures on following page*]

**WITNESS:**

**ISSAACSON STEEL, INC.**
**ISAACSON STRUCTURAL STEEL, INC.**

_____

By: _____
Its:

**NEW HAMPSHIRE BUSINESS FINANCE AUTHORITY**

_____

By: _____
Its:

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

_____

By: _____
Its:

**PASSUMPSIC SAVINGS BANK**

17

_____          _____
                                 By:
                                 Its:


                                 **TURNER CONSTRUCTION
                                 COMPANY, INC.**


_____          _____
                                 By:
                                 Its: