**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW HAMPSHIRE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ISAACSON STEEL, INC. | ) | Case No. 11-12415-JMD |
| ISAACSON STRUCTURAL STEEL, INC. | ) | Case No. 11-12416-JMD |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

**DEBTORS' DISCLOSURE STATEMENT DATED SEPTEMBER 18, 2013**
**PERTAINING TO JOINT PLAN OF REORGANIZATION OF EVEN DATE**

Pursuant to Section 1125 of the Bankruptcy Bankruptcy Code of 1978, *as amended*, 11 U.S.C. §101 *et seq*. (the "Bankruptcy Code"), **Isaacson Structural Steel, Inc.** and **Isaacson Steel, Inc.** (each, a "Debtor" and combined, the "Debtors") respectfully submit this Disclosure Statement pertaining to the Debtor's Plan of Reorganization of even date to Creditors and others who have filed demands for copies of all pleadings filed in this Case (collectively, "Plan Parties") pursuant to Section 1127 of the Bankruptcy Code. The United States Bankruptcy Court for the District of New Hampshire has entered an order which authorizes the Debtors to solicit acceptances of the Plan using this Disclosure Statement (the "Approval Order"). Except as otherwise disclosed herein, this Disclosure Statement is based on the information available to Debtor on the last day of the second month preceding the date hereof (the "Disclosure Date").

Respectfully submitted,

DATED: September 18, 2013

/s/ William S. Gannon
William S. Gannon, BNH 01222 (NH)

Attorney for:

**ISAACSON STRUCTURAL STEEL, INC.** and
**ISAACSON STEEL, INC.**

WILLIAM S. GANNON PLLC
889 Elm Street, 4th Floor
Manchester NH 03101
PH: 603-621-0833

1

CERTIFICATE OF SERVICE

I hereby certify that on this date I served the foregoing pleadings on each person named below by causing it to be filed electronically via the CM/ECF filing system or mailed by first class United States Mail, postage prepaid or in such other manner as may be indicated.

All persons on the attached Service List.


Dated:  September 18, 2013                    /s/ Beth E. Venuti
                                              Beth E. Venuti

2

**SERVICE LIST**

Ann Marie Dirsa – **ECF**
Geraldine Karonis **- ECF**
for U.S. Trustee

Joshua Menard – ECF
Dan Luker - ECF
For Passumpsic Savings Bank

Edward C. Dial, Jr. – ECF
For Ford Motor Credit

Daniel Sklar – ECF
Holly Kilibarda – ECF
For Creditors' Committee

David Azarian – ECF
For American Aerial Services

David Anderson – ECF
For Cate Street Capital

Christopher Allwarden – ECF
Honor Heath - ECF
For PSNH

Kristen Harris – ECF
Jonathan Starble - ECF
For Infra-Metals Co.

David Chenelle – ECF
For JM Coull, Inc.

Steven M. Notinger – ECF
For Steven Griffin

Joseph Foster – ECF
For The Eli L. Isaacson Family Trust
RB Capital, LLC;
Myron Bowling Auctioneers,
Hilco Industrial, LLC

James LaMontagne – ECF
Lisa Snow Wade - ECF
For Isaacson Steel, Inc.
Isaacson Structural Steel, Inc.

Lisa Snow Wade – ECF
for Orr and Reno, P.A.

Richard Levine – ECF
Cori Palmer - ECF

3

For Colby Company
John Moriarty & Associates, Inc.

John R.  Harrington – ECF
For Wells Fargo Equipment Finance

D. Ethan Jeffrey - ECF
Charles R. Bennett – ECF
For Turner Construction

Stephen Sutton - ECF
For Turner Construction
Liberty Mutual Insurance Company

Matthew Johnson - ECF
For Northway Bank

Gina Fonte – ECF
For The Richmond Group

Peter Hermes – ECF
For John Moriarty & Assoc.

Mickey Long – ECF
For Prime Steel Erecting
Universal Steel Erectors, Inc.

George Marcus – ECF
For NH BFA

Rodney Stark – ECF
For D.J. Driscoll and Company

Lizabeth M. MacDonald - ECF
For City of Berlin

Mark Derby – ECF
For Presby Steel

David C. Green – ECF
For RBS Citizens

Kelly Ovitt Puc – ECF
Irvin Gordon - ECF
for Arnold P. Hanson, Jr.

Wanda Borges - ECF
for Bushwick Metals, LLC

Jamie N. Hage  - ECF
for Steven Griffin

Douglas B. Rosner – ECF
Peter N. Tamposi - ECF
for Tron Group

Peter C.L. Roth  - ECF
for NH Dept. of Env. Services

Ryan D. Sullivan – Ecf
for All Metals Industries, Inc.

**PART ONE**

**PLAN AND DISCLOSURE STATEMENT OVERVIEW**

The purpose of this Disclosure is to provide Plan Parties with information adequate for them to make an informed judgment regarding the merits and benefits of the Plan.  It is not intended to be an exhaustive discussion of the Plan, which must be read carefully by Plan Parties.  Following Confirmation, the Plan will establish and govern the Debtor's and Plan Parties' Plan Rights and Obligations following Confirmation.

This Disclosure is divided into Parts which summarize in lay terms the Plan and the means for implementing the Plan and provides the other information mandated by the Bankruptcy Code and generally required by Bankruptcy Courts as a condition to the approval of a Disclosure.  This Part provides Plan Parties with an overview of the Plan and this Disclosure (the "Disclosure").  Part Two summarizes the Plan and the primary means for implementing the Plan using the same Article references and titles used in the Plan to make it easy to cross-reference the documents.   In Parts Three through Eight, which have no counterparts in the Plan, provide Plan Parties with information regarding the Debtor, the Significant Property of the Estate, the feasibility and risk to Plan Parties, the best interests of creditors and confirmability of the Plan and other matters.

If the Plan is Confirmed by the Bankruptcy Court, it  will divide Creditors and Equity Interest Holders into the Classes described in the following Table, which identifies each Class, the Dividends or range of Dividends to be paid on account of Allowed Claims in the Class and other information or the source of other information pertaining to the Class, including Appendix Exhibit C titled *Class and Claims Summary.*

On Confirmation – the approval of the Plan by the Court -- and the satisfaction or waiver of the conditions precedent described in this Plan Article, the Plan will become a valid, binding and enforceable contract between the Debtor and each Plan Party.  The Confirmed Plan will divide the Creditors and Equity Interest Holders into the Classes described in this Disclosure Statement and establish and govern the Debtor's and Plan Parties' Plan Rights and Obligations. The entry of the Confirmation Order will result in the complete satisfaction of all claims against Debtor, all liens and other interests in, to and on Property of the Estate and Equity Interests in the Debtor and enjoin Plan Parties from taking any action against the Debtor or the Debtor's Property prohibited by Bankruptcy Code Section 524 with respect to the claims, but shall not

extinguish the claims.  If, and to the extent that there should be any conflict or apparent conflict between the Disclosure Statement and this Plan, any such conflict shall be resolved in favor of this Plan.

**PART TWO**

**PLAN SUMMARY**

This Part Two outlines and summarizes the most important provisions of the Plan itself using the same Article and Section titles as those used in the Plan and appear in the same sequence as in the Plan.  The Classes are identified in Part One of this Disclosure.  Appendix Exhibit C titled *Class and Claims Summary* provides Plan Parties with more more information regarding the Classes to be created by the Confirmation of the Plan, including the names of the Creditors and Equity Interest Holders in each Class to the extent known to the Debtor, the estimated maximum and allowed amount of Claims in each Class, known disputes with respect to Claims in the Class and the Dividends or range of Dividends projected to be paid on account of Allowed Claims or Equity Interests in each Class.  Creditors should review Exhibit C because it constitutes an offer to allow undisputed Claims in the Estimated Allowed Amount set forth in the Exhibit.  Like every reorganization proceeding, the actual amount of Allowed Claims and the Dividends paid on account of Allowed Claims will more probably than not be different than the projection for many reasons, including the inevitable difference between the expected amount of Net Proceeds recovered on account of Causes of Action and the amount actually recovered by the Trust and the reduction of Claims, which are frequently overstated by Creditors.

**I.      Definitions.**

In the Introduction to the Plan, the Debtors identify the Global Settlement Agreement or "GSA" on which the Plan is built and the parties to the GSA – the Debtors, the Official Committee of Unsecured Creditors of the Debtors (the "Committee"), the New Hampshire Business Finance Authority ("BFA"), Passumpsic Savings Bank and its participants, Woodsville Guaranty Savings Bank and Ledyard National Bank (collectively, "PSB") and Turner Construction Company, Inc. ("Turner").  Plan Article I gives Plan Parties the definitions of many of the words, terms and phrases used in this Disclosure and the Plan.  Included in the definitions are the following, which are very important to understanding the Plan:  Administrative

Claim, Allowed, Allowed Amount, Assets, Cause of Action, Chapter 5 Causes of Action, Committee, D&O Claims, D&O Policy, GSA, Liquidating Trust, Priority Claim and Unsecured Claim.  The definitions are important because they add significant content to seemingly unimportant terms.  For example, Dividends will only be paid to Creditors holding Allowed Claims, but the definition of "Allowed Claim" explains to Creditors that not all Claims will be Allowed Claims.

## II.       Treatment of Non-classified Claims.

In this Plan Article, the Debtors establish the treatment of Allowed Administrative and Priority Claims under the Plan because the Bankruptcy Code prevents the "classification" of these Claims.  This Class includes the Administrative Claims already allowed the Debtor's Professionals totaling more than $375,000, and any additional Claims asserted by the Professionals, Turner Construction, Inc. and the Bankruptcy Fees due and becoming due the United States Trustee.  Exhibit C identifies the Creditors in this Class and the Maximum and Estimated Allowed Amount of their Claims.  At this time, the Debtors are unaware of any dispute regarding any Non-classified Claim, except for the Sales Tax Claim asserted by the Department of Revenue of the Commonwealth of Massachusetts which will be paid by Turner.

Under the Plan, Administrative and Priority Claims will be paid "in full upon the later of the Effective Date and the date which is thirty (30) days after the date upon which such Administrative Claim becomes an Allowed Administrative Claim" or "in accordance with any agreement between the Debtors and the holder of such Allowed Administrative Claim."  The GSA reflects the Professionals agreement to be paid from the waterfall funded by the Proceeds of the Causes of Action included in the Trust Assets.  Given the fact that the Debtors have no other source of funding, any other Allowed Administrative or Priority Creditors will have to agree to be paid from the waterfall as well.

## III.      Designation of Classes of Claims and Treatment.

This Plan Article divides the Debtors' Creditors into classes as required by the Bankruptcy Code.  Class One consists of all Allowed Claims against the Debtor held by PSB.  Class Two consists of all Allowed Claims against the Debtors held or asserted by BFA.  Class Three consists of all Allowed Unsecured Claims against the Debtors.  It includes Allowed Unsecured Claims resulting from a deficiency remaining after a Secured Creditor has paid the Proceeds of a sale or sales of Collateral or Collateral has been liquidated by a Secured

Creditor.  Class Four consists of the holders of all Equity Interests in and to each Debtor, including Equity Interests evidenced by stock issued by each Debtor.

**IV.      Treatment of Classified Claims.**

Article IV of the Plan dictates the payment and other treatment of the Allowed Claims in each of the Classes.  All of the Classes will be impaired by the Confirmation of the Plan.  Under this Article, Allowed Claims will be paid from the Proceeds of the Liquidation of the Proceeds of the Causes of Action contributed to the Liquidating Trust by the Debtor and PSB on a Class-by-Class basis in the order of their preferences, priorities and sharing rights under the Plan.

In essence, the Plan, which is based on the GSA and the Liquidating Trust described in Article V of the Plan, relies on the Trustees of the Liquidating Trust to liquidate the Causes of Action.  The liquidation will create two (2) income streams – (i) the Proceeds of the D&O Claims and (ii) the Proceeds of the Chapter 5 Actions and the Other Causes of Action (collectively, the "Chapter 5 and Other Actions").  BFA and PSB will receive a specified amount of the Net Proceeds of the D&O Claims before the other Beneficiaries share in the Proceeds.  Any remaining Net Proceeds of the D&O Claims and the Chapter 5 Actions and the Other Causes of Action will be shared by the Beneficiaries as provided for in the GSA and the Liquidating Trust, including the provisions thereof creating the Allowed Unsecured Creditors Gift Pool.

Dividends paid to Allowed Creditors in a Class in partial payment of their Allowed Claims will be allocated on a fractional basis, the numerator of which will be the amount of an Allowed Amount of the Claim and the denominator of which will be the total amount of Allowed Amount of Claims in the Class.  The Net D&O Proceeds and Net Proceeds of the Chapter 5 and Other Actions flow into waterfalls that distribute the Proceeds to Allowed Creditors based on the priorities established by the Bankruptcy Code, as modified by the final Orders Affecting Distribution Priority entered by the Bankruptcy Court and the GSA itself.

**V.      Means for Execution of the Plan.**

Pursuant to the GSA, the Debtors established the Liquidating Trust, known as the "Isaacson Steel Liquidating Trust", (the "Trust") has been or will be established by the Debtors and the Trustee.  The Debtors will fund the Trust with all of their (i) cash (except that to be retained by the Debtors to wind up their affairs), (ii) D&O and E&O Claims and (iii) Chapter 5 and Other Actions (the "Trust Assets").  The administration, use and distribution of the Trust

Assets shall be governed by the Trust and GSA.  The Trust and a redacted copy of the GSA are included in the Appendix.

In essence, the Trust will become responsible for the implementation of the Plan.  One of its purposes is to prosecute claims against former officers and directors of the Debtor, as insured individuals under the D&O Policy.  The Trust is a proven means of avoiding the "insured v. insured" exclusion contained in the Debtor's D&O Policy.  The pertinent exception to the "insured v. insured" exclusion provides in pertinent part that:

> "a Claim brought against Insured Persons of any Insured Organization by a bankruptcy trustee, receiver, liquidator, conservator, rehabilitator, creditors' committee or any similar official who has been appointed to take control of, supervise, manage or liquidate the: Parent Corporation"

> shall not be excluded from coverage under the D&O Policy by virtue of the "insured v. insured exclusion.

To protect the Estates, the entry of the Confirmation Order will constitute a finding and determination of the Court, binding upon all parties in interest, that the Trust is a "bankruptcy trustee, receiver, liquidator, conservator, rehabilitator, creditors' committee or any similar official who has been appointed to take control of, supervise, manage or liquidate the Parent Corporation" within the meaning of the D&O Policy, and that claims brought by said Trust against present or former officers and directors of the Debtor satisfies the exception to the "insured v. Insured" exclusion set forth in the D&O Policy.

## VI.    The Effective Date.

The Plan will become effective and binding on the Debtors, the Trustees and all Plan Parties on the twentieth (20th) day following the Confirmation Date.  The Debtors intend to ask the Bankruptcy Court to schedule a combined hearing on the adequacy of this Disclosure Statement and the Confirmation of the Plan for mid-October, 2013 and shorten notice to the extent reasonably necessary to accomplish that goal.  Based on that assumption, the target Confirmation and Effective Dates are mid-October and early November, 2013.

## VII.   Executory Contracts and Unexpired Leases Other than the D&O Policy.

This Plan Article governs the assumption and rejection of executory contracts and

unexpired leases of real estate.  The Debtors do not believe that they are parties to any unexpired leases or any executory contracts although they do have, or may have enforceable rights to recover payments and retainage due under contracts with John J. Moriarity and Associates, Inc. and others.  Unless a Debtor files a motion to assume an executory contract on or before the Effective Date, any and all executory contracts that were entered into prior to the Filing Date shall be deemed rejected as of the Filing Date without prejudice to a Debtor's claims and other rights against the Non-debtor Party to the executory contract, but not terminated under applicable state law.

Any claim for damages arising from the rejection or deemed rejection of an executory contract or unexpired lease must be filed on or before thirty (30) days after written notice of the Confirmation Date to the non-Debtor party to such contract or lease, or by such other date as may be specified by Order of the Bankruptcy Court and, if not so filed, will be deemed disallowed, discharged, and forever barred from receiving any distribution under this Plan.  All Allowed Claims arising from the rejection of executory contracts and unexpired leases shall be classified as Unsecured Claims.

**VIII.    Miscellaneous Provisions.**

This Article includes provisions that address primarily the mechanics of implementing the Plan and some of the effects of Confirmation. Confirmation will dissolve the Committee, but Creditors will be represented by the Trustee appointed by the Committee to ensure that they have a continued voice.  It also limits Dividends to the Holders of Allowed Claims and establishes the procedures for filing and objecting to Proofs of Claim and Motions for Allowance of Administrative Claims, including the due dates thereof, and requires the payment of Dividends in cash.  Further, this Article makes the entry of the Confirmation Order a release and discharge of all Encumbrances on the Debtor's Property and an injunction applicable to all persons, staying and enjoining the enforcement or attempted enforcement by any means of all liens, claims, Encumbrances, and debts discharged pursuant to the Plan.

In addition, the Debtors claim the exemption from docuthis Article reserves to the Debtors the right to modify the Plan as permitted by Section 1127 of the Bankruptcy Code and the right to "remedy any defect or omission or reconcile any inconsistency in the Plan or Confirmation Order in such manner as may be necessary or appropriate to carry out the purposes and intent of the Plan, so long as the holders of Claims and Equity Interests are not

materially and adversely affected."   It also permits the Bankruptcy Court to retain jurisdiction over these Cases after Confirmation for a slightly broader than that permitted by Local Bankruptcy Rule 3020-1 and reserves a fairly open-ended right to conditionally reserve the question of additional retained jurisdiction in the order confirming the Plan by filing a motion on notice requesting retention of such additional jurisdiction as necessary, to be embodied in a supplemental order.  By reference to the applicable Bankruptcy Code provisions, the Article defines when "Substantial Consummation" and the "Closing of Case" will be deemed to occur by reference to the governing Bankruptcy Code provisions.

**PART THREE**

**THE PRE-PETITION DEBTOR, CAUSE OF BANKRUPTCY AND
SIGNIFICANT EVENTS DURING CASES**

This Part Three does not have a Plan counterpart.  It provides Plan Parties with pre-petition information regarding the ownership and management of the Debtor and the primary reason or reasons that the Debtor sought protection under the Bankruptcy Code and a summary of the significant events that occurred during the Case.

**IX.     Relationship of Debtors, Pre-petition Ownership and Management.**

The Debtors are affiliated through the majority and controlling Equity Interests in the form of common stock owned by Arnold Hanson and Steven Griffin.  Norman Lefebvre and Terry Block held minority Equity Interests in ISSI and ISS.  Mr. Hanson and Mr. Griffin served as the Directors of the Debtors according to the Annual Reports filed with the New Hampshire Secretary of State although Mr. Hanson believes that Mr. Lefebvre and Mr. Block were Directors as well.  Mr. Hanson and Mr. Griffin served as the President and Chief Financial Officer of the Debtors before the Filing Date.  With respect to ISSI, Mr. Lefebvre and Mr. Block served as Vice Presidents of the Debtors.

**X.     Significant Events During Case.**

**A.     Maintenance of Separate Books of Account and Financial Records.**
Throughout this Case, the Debtors continued to keep separate books of account and financial records during this Case just as they had done before the Filing Date.  No basis existed for substantive consolidation – treating the Debtors as one -- in the Debtors' opinions.  As a result, these Cases were administered jointly with each Debtor retaining its separate identity, Property and liabilities.

B.       **Effort to Continue Business.**

On the Filing Date, the Debtors planned to continue their Businesses, which employed more than 165 people.  ISSI convinced Turner Construction, Inc. to permit it to continue and complete the so-called Liberty Mutual Contract, which was expected to provide ISSI with enough revenue to be profitable while securing more new contracts.  The Debtor borrowed $500,000 from Cate Street Capital, Inc. for use as working capital with Bankruptcy Court Approval.  Later in the Case, the Bankruptcy Court authorized ISSI to borrow up to $2,250,000 from BFA for the purpose of refinancing the Cate Street Loan and providing the additional working capital needed to complete the Liberty Mutual Contract and other contracts .

C.       **Retention of Robert Wexler and Tron Group; Griffin Resignation.**

Early in the Case, the ISSI retained Robert Wexler and Tron Group to act as its business and financial consultant with Bankruptcy Court Approval.  The Debtor believed that it needed to bolster the confidence of PSB, Turner and other customers ensure tight, effective cash management and accounting controls.  Mr. Wexler brought with him Phyllis Lengle, who acted as the Debtor's Comptroller.  At the end of 2011, Mr. Griffin resigned as ISSI's Chief Financial Officer leaving Mr. Hanson and Mr. Wexler and Ms. Lengle to do his work.

D.       **Sales and Abandonments of Certain Property.**

During the Case, ISSI sold a few pieces of excess equipment and abandoned Property of inconsequential value with Bankruptcy Court Approval.  ISSI sold a 2001 and 2008 Kenworth Tractors and paid the Net Proceeds to PSB and Wells Fargo Equipment Finance, Inc., respectively, which held first priority Liens on the vehicles.  With Bankruptcy Court Approval, ISSI abandoned a 2009 BMW 535XI and 2009 GMC Acadia without consideration, except that Norman Lefebvre and Sara Marvin remained responsible to pay the liabilities secured by the vehicles and have done so.

E.       **Completion of Contracts.**

The Debtors have completed all of their contracts for the fabrication and/or erection of steel.  There are no breach of contract, completed operations or product liability claims of which they have been put on notice.  MasterCraft, the General Contractor on the Middletown, New York School District Project, remains liable to ISSI.  ISSI may be entitled to retainage payments due under contracts entered into with Moriarity.  Under the Plan, these Causes of Action will be

transferred to the Trust.

**F.      Sales of All or Substantially All of Debtors' Assets.**

During the Case, the Debtors realized that they could not develop enough new business to be viable entities without new investors or a buyer that would continue the Business.  The Debtors retained General Capital Partners, LLC to act as their investment banker with Bankruptcy Court Approval.  The Investment Banker spent months diligently, but unsuccessfully seeking investors, partners, joint venturers and strategic allies for the Debtors.  The Investment Banker and Mr. Hanson convinced Presby Steel, LLC to buy all or substantially all of the assets of Steel for approximately $225,000 during January 2012.  Virtually all of the Proceeds of the Presby Sale were paid over to PSB and the Berlin Industrial Development Park Authority ("BIDPA"), which had financed a significant amount of equipment for Steel.  As a result, Steel has no Property, except for its Causes of Action.

ISSI spent months and a substantial amount of time and money and negotiating a sale of all or substantially of its Property with Heico Holding, Inc..  ISSI believed for a long time that the transaction would go forward and close.  The only issue seemed to be whether or not the ISSI's business premises, which had been built on the City of Berlin Landfill, were contaminated by hazardous waste despite environmental reports, which almost eliminated the contamination issue.  ISSI offered to pay for an environmental report to move the transaction forward.  When Heico refused the offer, ISSI concluded that Heico had no real intention of buying ISSI's operating assets.

Even before the Heico negotiation reached their end, ISSI decided that it might have to auction off its Property.  ISSI sought and received Bankruptcy Court Approval to sell all, or substantially all of its tangible Property at an auction advertised and conducted by ISSI.  A venture comprised of RB Capital, Myron Bowling Auctioneers and Hilco Industries  bought ISSI's Property for $2,400,000 at the auction.  The Bankruptcy Court confirmed the sale at ISSI's request.  After paying its Professionals 12% of the Auction Proceeds and its customary and usual costs and expenses, ISSI paid over the balance of the Proceeds to PSB for application to its Secured Claim.

**G.      Cash Collateral Use and Impact.**

The Debtors regularly requested and received Bankruptcy Court permission to use cash

collateral to fund their operations.  ISSI's accounts receivable declined over the course of its
Case.  The Order on the Debtor's Third Motion for Order Authorizing Use of Cash Collateral
allowed the Debtors' request for continued use of the proceeds of its accounts receivable.  The
Order also required the Debtor to pay over its $640,000 tax refund to PSB and granted BFA and
the Estate and PSB a Tier 1 Superpriority Claim in the amount of $240,000 each and the Estate
and PSB a Tier 2 Superpriority Claim in the amount of $260,000 each.  The Superpriority
Claims total $1,000,000.  Turner shares the PSB Tier 1 and 2 Claims with PSB on a pari passu
or ratable basis.  The Allowed Adminstrative Expense Claims held by the Debtor's Professionals
are are senior to Turner's share of the Superpriority Claims.     Through the Global Settlement,
the Allowed Superpriority and Allowed Administrative Expense Creditors compromised their
payments to make a gift to the General Unsecured Creditors.

### H.    BFA Loan.

The Bankruptcy Court granted ISSI's Motion for Order Authorizing Debtors to Enter
Working Capital Financing Arrangment with New Hampshire Business Finance Authority on
December 1, 2011 (the "BFA Borrowing Motion" and "BFA Borrowing Order").  ISSI borrowed
approximately $1,150,000 from BFA pursuant to the documents executed in connection with the
borrowing (the "BFA Loan" and "BFA Loan Documents").  ISSI granted BFA (i) a first priority
Lien in, to and on the Debtor's Causes of Action against its Directors and Officers as security for
the repayment of the BFA Loan.  BFA also holds an Allowed $240,000 Superpriority Claim on
the Proceeds of the Debtors' Chapter 5 Actions to the extent that the BFA Loan is not paid in full
from the Net Proceeds of the DO Claim.  The Debtors owe BFA approximately $1,150,000.
Further, PSB agreed that it would share any recovery made in the action filed against David J.
Driscoll, his accounting firm and Steven Griffin until BFA is paid in full.

### I.    The Global Settlement Agreement.

The Appendix includes the Global Compromise and Settlement Disclosure and a slightly
redacted copy of the Global Settlement Agreement (the "Settlement Disclosure").  The Debtors
and the Creditors Committee, BFA, PSB and Turner entered into the Agreement to maximize
the value of the Debtors' DO Claims, Chapter 5 Actions and Other Causes of Action, maximize
their own recoveries and create a pool of funds for the Debtors' Unsecured Creditors (the
"Unsecured Creditor Gift Pool") through a series of deep compromises and "carveouts" or "gifts"
made by the Settling Parties from the Dividends that would otherwise be paid on account of

their already Allowed Secured, Superpriority and Administrative Expense Claims.  Without the Settlement, General Unsecured Creditors holding Allowed Claims would not receive any Dividends on account of their Claims.

PART FIVE

**SIGNIFICANT PROPERTY, ESTIMATED VALUES AND HYPOTHETICAL LIQUIDATION**

This Part has no counterpart in the Plan.  It describes and values the "Significant Property" of the Debtors' estates[1] -- property having an estimated value of $5,000 or more on a reorganization value basis -- on a reorganization and liquidation basis based on the proposed use of the Property under the Plan and the value information possessed and assumptions made by the Debtor.  It also provides Plan Parties with a summary of a hypothetical liquidation of the Significant Property

**XI.      Significant Real Property and Value.**

      **A.        Liquidation Assumptions.**

The Debtors assume that any liquidation would be conducted through a Chapter 7 Trustee in an unfunded Chapter 7 liquidation proceeding.  The Bankruptcy Code permits Chapter 7 Trustees to be paid fees based on the amount of money or property disbursed or abandoned to creditors.  This Disclosure assumes that a Chapter 7 Trustee would be paid a fee of 3% and would not retain other professionals.  The fees will constitute an administrative expense senior to those held by the Debtor's Professionals and Turner and all other Unsecured Claims to the extent approved by the Bankruptcy Court.  The amount of the Chapter 7 Trustee Fees depends on the amount disbursed or turned over by the Trustee to parties in interest.  A recovery of $5,000,000 on the Debtor's DO Claims would result in a Trustee's Fee alone in excess of $150,000.  Further, a Chapter 7 Trustee retains counsel, often the Trustee himself, accountants and other professionals that add another layer of cost and expense.

In this Case, the Debtors assume that a Chapter 7 Trustee would not be able to pursue the DO Claims effectively.  The Trustee would have to compete with PSB, which has already filed its action in an effort to collect more than $10,000,000 in damages.  The Trustee would

---

[1] In Schedules A and B to the Debtors' Petitions, the Debtor listed all of the real and personal property owned by the Debtors on the Petition Date.

have to convince BFA to refrain from foreclosing its court-approved, first priority Lien on the Debtor's DO Claims and finance all or a significant part of the costs and expenses of conducting the litigation, exclusive of attorneys fees which might well be payable on a contingent fee basis. BFA and PSB have already agreed to share the Net Proceeds of any recovery made by PSB pari passu until BFA has been paid in full.  As a result, the Debtor might recover less than $2,000,000 on account of its DO Claims irrespective of their merit.

If the Settling Parties are burdened with the increased Chapter 7 Administrative Expenses, there is little reason for the Settling Parties to fund the Unsecured Creditors Gift Pool.  A Chapter 7 Trustee might recover the same amount on account of the Chapter 5 Actions as will the Debtors.  Even if a Chapter 7 Trustee recovers the same amount as the Debtors, there will be hundreds of thousands of dollars in additional cost and a minimum of $300,000 less to pay out as Dividends.

### B.    No Real Property.

Steel never owned any real property.  It leased its business premises from BIDPA.  The Lease was terminated as part of the Presby All Asset Sale without liability to the Steel.  ISSI sold its real property as part of the All Asset Sale.  As a result, the Debtors have no real property or interests in real propery.

### C.    Significant Personal Property and Value.

The Debtor has very little cash on hand.  The cash is earmarked to pay the fixed fees of Verdollino & Lowey for preparing and filing the Debtors' Federal and State Income Tax Returns and maintaining the Debtors' records for use in various pending and anticipated proceedings involving the Debtors, including the DO Claims and the Chapter 5 Actions.  Any remaining cash will be transferred to the Trust and used to pay or defray the costs of prosecuting the Causes of Action.

Except for the cash on hand, the Debtors have no Property other than the Causes of Action.  The Debtor has asserted approximately 43 Chapter 5 Actions claiming approximately $6,461,128.00 in total.  The Debtor doubts that it will recover more than $1,750,000 on account of the Chapter 5 Actions (the "Chapter 5 Proceeds"), less an estimated cost projected to be 20% of the gross Proceeds on average or $350,000.  From the Net Chapter 5 Proceeds estimated to be $1,400,000, the Debtor will have to pay the $1,000,000 in Allowed Superpriority Claims and

$375,000 in Allowed Professional Claims and any Quarterly Fees due the United States Trustee leaving nothing for the other Priority and Non-priority Unsecured Creditors even without Chapter 7 Administrative Expenses.

The Other Causes of Action range in value.  The Middletown Action arises out the contract to supply fabricated steel used in the construction of a school for the Middletown School District.  The Middletown Action is subject to the BFA Lien, but the Settlement transfers the net recoveries from the Middletown Action to the Liquidation Trust to fund the Litigation and pay distributions to allowed Creditors.  The Debtor expects to recover $50,000 to $80,000 from the Middletown Action, less litigation costs and expenses.  The Net Middletown Proceeds will not be between $52,800 and $$37,500 in the Debtor's opinion.  The outcome of the Hilton Hotel Action is uncertain, and cannot be quantified.  Similarly, Other Actions arising from overpayments to subcontractors have been assigned no value because of the complexity of bond claims.

The wasting DO Policy and EO Policy provide a maximum of $5,000,000 in coverage for the various claims asserted against Driscoll, Griffin and Hanson in the Driscoll, Inframetals and Moriarity Actions and those to be asserted against them by the Debtor and possibly more if the losses result from multiple occurrences .  "Wasting" means that the amount of coverage provided by an insurance policy is reduced by "Defense Costs" paid by the insurer.  The Debtor and the other Settling Parties do not know (i) the amount of the coverage available under the DO and EO Policies, (ii) if the Driscoll EO Policy is a wasting policy or (iii) how much the insurers have already paid to the several law firms representing counsel to Driscoll, Griffin and Hanson, but assume that it is substantial or.  Even if the Settling Parties could value with reasonable certainty the DO Claims, they would not because it would adversely affect future settlement negotiations with the insurance carriers to the detriment of Creditors.

## XII.    Hypothetical Liquidation Summary.

The Appendix includes an Exhibit captioned Hypothetical Liquidation Summary.  The Liquidation Summary depicts the distribution of the Net Proceeds of the Causes of Action.  It values the Causes of Action on a gross Proceeds basis for descriptive purposes as follows:  (i) the DO-EO Claims at $5,000,000 and $2,000,000, (ii) the Chapter 5 Actions at $1,750,000 and $1,000,000 and (iii) the Other Causes of Action at $52,800 and $37,500.  The Debtors deducted from the Proceeds the Trustee's statutory fee, a 33.3% cost of collection in the case of the DO-

EO Claims, which will be abnormally expensive to prosecute, 20% in the case of the Chapter 5 Actions, 50% in the case of the Hilton Hotel Action and 25% in the case of the other Causes of Action.  The Debtors assumed that obtaining injunctive relief against PSB would cost at least $75,000.  Finally, the Debtors assumed that the other Settling Parties would not fund the Unsecured Creditors Gift Pool in a liquidation and that Turner would not pay the Massachusetts Sales Tax without asserting a Superpriority or Administrative Expense Claim on account of the $520,000 payment.

Given the number of variables, the Bankruptcy Court accurately described a Plan based on the GSA as a lottery ticket because it will be funded entirely from the Proceeds of the Causes of Action, which may be more or less than the amounts shown in the Liquidation Summary.

In the scenario based on the The Allowed BFA Secured Claim and the Allowed PSB Competing Claim would probably be in full from the DO-EO Proceeds, the Allowed Superpriority Claims held by the BFA or the Estate, PSB and Turner

## PART SEVEN

### PLAN RISKS, FEASIBILITY AND BEST INTERESTS OF CREDITORS

`        This Part has no Plan counterpart.  also discusses the risks inherent in the Plan and the feasibility of the Plan.  Finally, this Part explains the Debtor's opinion that the Confirmation of the Plan furthers the best interests of Creditors.

**XIII.    Confirmation Generally.**  At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Bankruptcy Code are met.  Among the most important requirements for confirmation of the Plan are that Plan: (i) is accepted by all impaired Classes of Claims and Equity Interests, (ii) is feasible and not likely to followed by the liquidation or the need for further financial reorganization, unless such liquidation or reorganization is provided for in the Plan (the "Feasibility Test"), and (iii) to the extent that any Holder of a Claim or Interest in an impaired Class does not vote for the Plan, the Plan satisfies the Best Interests of Creditors Test – the Holder an Allowed Claim will receive or retain under the Plan property of a value that is not less than the amount that would have been received or retained if the Debtor were liquidated under Chapter 7 of the Bankruptcy Bankruptcy Code.  Even if an Impaired Voting Class rejects the Plan, the Court may Confirm the

Plan by "cramming it down" if the Plan satisfies all of the requirements of Bankruptcy Code Section 1129(a), except (a)(8), and "does not discriminate unfairly" and is "fair and equitable" as to such Class

**XIV.    Risk Analysis and Feasibility.**

      **A.    Significant Plan Assumptions.**

Among others, the Plan is based on the following assumptions which the Debtor believes to be material:

      **1.** Unlike the mutually assured cost and expense destruction that would result from courthouse races and litigation among the Settling Parties, the Plan built on the GSA and Settlement (collectively, the "Plan") permits the Debtors and the other Settling Parties to focus their time and resources on recovering money for Creditors.

      **2.** The Plan creates the Gift Pool for Unsecured Creditors holding Allowed Claim, which gives them a share of the first dollars collected on account of the Chapter 5 Action despite the Bankruptcy Code, as modified by the Orders Affecting Distribution, which make their rights to Dividends junior to the Allowed Secured Claim held by BFA and the Allowed Superpriority and Administrative Expense Claims held by BFA, PSB, Turner and the Professionals.  The Plan requires or results in BFA, PSB, Turner and the Professionals making "carveouts" or "gifts" to Unsecured Creditors, which they hope will be $300,000 or more.  In a liquidation, the Settling Parties could not be forced to make the gifts.

      **3.** The Plan also results in Turner's paying the asserted Massachusetts Administrative Tax Claim in an amount in excess of $520,000.  Outside of the Plan, the Debtor would have to incur substantial costs estimated to be $35,000 to dispute this administrative claim.

      **B.    Risk Analysis.**

Analyzing and quantifying risk requires comparing the probable outcomes of alternative courses of action.  A reorganization plan funded solely by the proceeds of litigation is risky in the sense that the results are uncertain at best under any circumstances.  In these Cases, however, the only alternative to the Plan and Settlement is a liquidation, which is not a meaningful choice as shown by the .

Unlike a liquidation, the Plan limits the risks imposed on Creditors other than the Settling Parties.  Only PSB, BFA and the professionals retained by the Trust will fund the prosecution of the Causes of Action by the Trust and Trustees for the benefit of all Beneficiaries.  The Plan does not ask or require other Creditors to make any financial contribution to the litigation effort. In fact, the Plan literally gives the other Creditors the benefit of the Gift Pool, any funding provided by BFA and PSB and the efforts of the Trust.  A Chapter 7 Trustee might seek to use the Chapter 5 Action Proceeds to fund the DO and EO Actions.  Not only does the Plan remove that risk, but it does not impose any risk on Creditors (other than the Settling Parties) greater than would be placed on them in a liquidation.  The Plan offers Non-settling Party Creditors a much better hope than the liquidation alternative.  In fact, the Plan is less risky than the liquidation alternative.

### C.    Plan is Feasible.

In general, "feasibility" means that the Confirmation of the Plan will not likely be followed by the "liquidation, or the need for further financial reorganization of the Debtor or any successor to the debtor," except as provided for in the Plan.  The Debtors will grant, convey, assign and otherwise transfer to the Trust all of their Remaining Property, except for the cash retained to pay their winding up costs and expenses, immediately after the entry of the Confirmation Order if they have not already done so based on Bankruptcy Court Approval of the Global Settlement Motion.  The Debtors will then dissolve themselves in accordance with applicable State law. Following the transfer of the Remaining Property to the Trust, the Trustees and the Trust shall be solely responsible for the implementation of the Plan, including the liquidation of the Trust Assets subject to the approval and supervision of the Bankruptcy Court as provided for in the Plan and payment of the Dividends due Allowed Creditors.  The Trust will liquidate the Trust Asset and then dissolve itself.  As a result, the "liquidation" of the Debtors and their successors is proposed by the Plan making it feasible.

From a practical standpoint, the Debtors will be able to implement the Plan easily.  The implementation of the Plan is not contingent on a number of conditions precedent that may or may not be satisfied.  All of the agreements necessary to implementation are included in the Settlement.  the Debtors need to do transfer the Remaining Property to the Trust, an act totally within their control.  At that point, substantial consummation will have occurred.

### XV.    Plan Is in the Best Interests of Creditors.

### A.    Comparison of Plan Dividends to Liquidation Distributions.

The Appendix includes an Exhibit captioned Comparison of Plan Dividends to Hypothetical Liquidation Distributions.  The Allowed BFA, PSB and Turner Superpriority and Professionals' Allowed Administrative Claims are senior to Allowed Unsecured Claims under the Bankruptcy Code.  Any Administrative Claims held by the Mass-DoR and Turner will also be senior to Allowed Unsecured Claims.  The range of Administrative Claims seems to be $1,975,000 in the very best possible case and more than $3,475,000 in the very worst possible case.  Although the Debtor believes that Turner will be able to document at least $1,600,000 in cost overruns on the Liberty Mutual Contract, the timing of the overruns is a real issue as is the ISSI's liability to pay the $520,000 Massachusetts Sales Tax.

Under the GSA negotiated for the benefit of Allowed Unsecured Creditors, they begin participating in distributions made from the Estates' share of Net D&O Claim Proceeds and the Net Proceeds of Chapter 5 Actions and Other Causes of Action immediately on an unequal *pari passu* basis with the Turner on account of its Allowed Administrative Claim from the first dollar payable on account of that Claim until Turner has recovered a fixed sum that is significantly less than $1,600,000.   The Allowed General Unsecured Creditors receive the next dollars recovered on account of the Chapter 5 and Other Actions  until they have received a total of $300,000 through the Allowed Unsecured Creditors Gift Pool as shown by the Plan Dividend-Liquidation Distribution Comparison.  As shown by the Hypothetical Liquidation Summary, Allowed Unsecured Creditors would not recover any money through the Hypothetical Liquidation of the Debtors' Property.

### Plan is in Best Interests of Creditors as a Whole.

The approval of the Settlement is in the best interests of Creditors within the meaning of the Code.  "Best interests of Creditors" means generally that Impaired Creditors will receive pursuant to the proposed plan of reorganization Dividends at least equal to the amount they would receive in a liquidation under Chapter 7.  Determining whether or not the Plan satisfies the Best Interests Test requires a comparison of the Dividends are expected to receive under the Plan to the Distributions that Impaired Creditors would receive in a hypothetical liquidation. For the reasons explained in the following Paragraphs, the Debtor expects that Unsecured Creditors will receive more money through the Confirmation and implementation of the Plan than they would if a Chapter 7 Trustee attempted to liquidate the Causes of Action outside of

the Plan and the GSA.

**XVI.    Cramdown and Absolute Priority.**

Section 1129(b) of the Bankruptcy Bankruptcy Code permits a  bankruptcy court to confirm a Plan even if an Impaired Voting Class rejects the Plan or a creditor objects to its Confirmation through a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interest Holders that is Impaired under, and has not accepted, the Plan. The Debtor will be seeking nonconsensual confirmation of the Plan with respect to each Class of Claims that is entitled to vote to accept or reject the Plan if such Class rejects the Plan. The Debtor reserves the right to alter, amend, modify, revoke or withdraw the Plan or any Plan exhibit or schedule, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Bankruptcy Code, if necessary**.**

Nonconsensual or "Cramdown" Confirmation requires the Bankruptcy Court to find that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired, Non-accepting Class (the "Fair and Equitable Test").  The requirement that the Plan be "fair and equitable" with respect to each Impaired, non-accepting Class is also known as the "absolute priority rule."  Since the only Secured Creditor is BFA, which is a Settling Party and has consented to the Confirmation of the Plan, the Court need only find that the Plan is "fair and equitable" means with respect to Allowed Unsecured Creditors and Allowed Equity Interest Holders.

With respect to Classes including Unsecured Claims, satisfying the "Fair and Equitable Test" requires that either (i) each impaired, Unsecured Creditor will receive or retain under the Plan money or other Property of a value equal to the amount of its Allowed Claim, or (ii) the Holders of Claims and Equity Interests that are junior to the Claims of a rejecting Class of Unsecured Creditors will not receive or retain any money or other Property under the Plan.  All of the Creditors holding Allowed Superpriority and Administrative Expense Claims are Settling Parties and have consented to the Confirmation of the Plan contemplated by the Global Settlement Agreement.  In this Case, the Fair and Equitable Standard could become an issue.

If the Equity Interest Holders Class rejects the plan, Confirmation requires that either (i) each Holder of an equity interest will receive or retain under the Plan property of a value

equal to the greatest of the fixed liquidation preference to which such Holder is entitled, the fixed redemption price to which such Holder is entitled, or the value of the interest or (ii) the Holder of an interest that is junior to the non-accepting Class will not receive or retain any property under the Plan.  In this Case, (i) the Equity Interest Holders have no fixed liquidation preference or fixed redemption price and the value of the Allowed Equity Interests is $0 and (ii) there is no Holder of any interest which is junior to the Equity Interests held by Mr. Hanson, Mr. Griffin, Mr. Lefebvre and Mr. Block.

A Creditor need not object to Confirmation if the Creditor decides that the Confirmation of the Plan serves the Creditor's intersts better than the liquidation of the property of the estate. The Debtor expects Creditors reach that conclusion in this case simply by comparing the Dividends that they will be paid pursuant to the Plan with the disastrous results of the Hypothetical Liquidation.  Given the treatment of all Classes of Claims and Interests under the Plan, the Debtor believes that the Plan satisfies "Cramdown" requirements for the nonconsensual confirmation of the Plan.

**PART EIGHT**

**ADDITIONAL DISCLOSURES**

**XVII.   Tax Returns and Tax Consequences to Creditors.**

**A.      Status of Federal and State Tax Returns.**  The Debtor has requested and received an extension of the date by which the Debtor must file its Federal and State Tax Returns for the years 2012 and 2013.  The tax consequences may and more probably than not will vary among the Plan Parties because of their unique business and tax considerations and the claim itself.  Consequently, Creditors are urged to consult with their tax advisors in order to determine the tax implications of the Plan under federal and state law.

**B.      Acquisition of Claims by Insiders.**  No Claims have been acquired by any insider since the Filing Date.

**C.      Claims Listed as Contingent, Disputed or Unliquidated.**  In Schedules D, E and F, the Debtor described some of the Claims asserted by Creditors as being contingent, disputed or unliquidated.  The Notice of First Meeting of Creditors warned each creditor holding a disputed claim that the creditor had to file a Proof of Claim on or before the Bar Date, which has now passed.  As a result, the Debtor will object to any disputed claim listed in the Petition with

respect to which the creditor did not file a Proof of Claim.

**D.    Administrative Expense Claims.**  All Professionals holding Administrative Claims against Debtor must file a written Notice of Estimated Administrative claim with Debtor's Counsel at least 5 days before the Confirmation Hearing, which shall be accompanied by a detailed statement describing the services, rendered to the bankruptcy estate.  Within 30 days after the Confirmation Date, Final Applications for compensation must be filed pursuant to Section 330 unless the Bankruptcy Court enters an order extending such date.

## XVIII.   QUALIFICATIONS AND LIMITATIONS

**A.    Primary Source of Information.** The information contained in this Disclosure Statement came from Debtor's management and its books of account and other business and financial records.

**B.    Dating of Information and Statements.**  All of the statements contained in this Disclosure Statement are being made as of the Disclosure Date.

**C.    Limited Use of Disclosure Statement.**  Only Plan Parties are intended to receive and use the information contained in this Disclosure Statement.  It has been prepared by Debtor to provide Plan Parties with adequate information to permit them to make an informed decision about the merits of the Plan.  Although the Bankruptcy Court determined that this Disclosure Statement provides adequate information, its Order approving the Disclosure Statement does not mean and should not be interpreted to mean that the Bankruptcy Court has endorsed or determined that the Plan will or will not be successful or that Creditors should vote for it.

**D.    No Approval of Securities Regulators.**  No benefits offered to Plan Parties under the Plan have been approved or disapproved by the Securities and Exchange Commission ("SEC"), New Hampshire Office of Securities ("NASD") or any other governmental authority.  Neither the SEC, NASD nor any other governmental authority has passed, or will pass upon the merits of the Plan except for the Bankruptcy Court.

**No Other Representations.**  No representations concerning Debtor, particularly regarding future business operations or the value of Debtor's assets, have been authorized by Debtor, except as set forth in this statement.