**2013 BNH 010**       Note:   This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:                                                                    Bk. No. 11-12415-JMD
                                                                          Bk. No. 11-12416
                                                                          Chapter 11

Isaacson Steel, Inc.
Isaacson Structural Steel, Inc.,
            Debtors

*William S. Gannon, Esq.*
*William S. Gannon PLLC*
*Manchester, New Hampshire*
*Attorney for Debtors*

*George E. Marcus, Esq.*
*Marcus, Clegg & Mistretta, P.C.*
*Portland, Maine*
*Attorney for New Hampshire Business Finance Authority*

*D. Ethan Jeffery, Esq.*
*Murphy & King, P.C.*
*Boston, Massachusetts*
*Attorney for Turner Construction, Inc.*

*Joshua E. Menard, Esq.*
*Gregory A. Moffett, Esq.*
*Preti Flaherty Pachios & Beliveau, PLLP*
*Concord, New Hampshire*
*Attorney for Passumpsic Savings Bank*

## <u>MEMORANDUM OPINION</u>

## I.  INTRODUCTION

On February 29, 2012, Debtors Isaacson Steel Inc. (ISI) and Isaacson Structural Steel,

Inc. (ISSI) (collectively, the "Debtors"), sold a substantial portion of their assets pursuant to an

Order dated February 1, 2012.  (Doc. No. 602).  Shortly before the sale, Creditor Turner

Construction, Inc. ("Turner") had filed a Motion to Approve Wind Down Budget, to which

creditors Passumpsic Savings Bank ("Passumpsic") and the New Hampshire Business Finance Authority (the "BFA") objected.  (Doc. Nos. 544, 622, 864, 865, 867) . The Court directed the parties to file a joint Final Prehearing Statement regarding the evidentiary hearing to be held on the wind down budget dispute and the allocation of the Debtors' Ending Cash.

At a preliminary hearing on November 19, 2012, the Court approved a settlement with respect to the disposition of certain assets that had either been reserved by the Debtors or were remaining in the Debtors' estates at the conclusion of their respective active business operations (the "Stipulation"), and created four cash reserves (the "Cash Reserves"), in which Passumpsic claims an interest. (Doc. No. 894).  The Court scheduled a further evidentiary hearing on November 27, 2012.  At the hearing, the parties made oral arguments, presented testimony from two witnesses, and stipulated to BFA's exhibits 101-108 and Passumpic's exhibits 201- 216. The Court took the matter under submission and directed the parties to submit written closing arguments.  A Stipulation entered into by the Debtors, Turner, and the BFA was approved by order of the Court on December 12, 2012. (Doc. No. 935) (the "Stipulation").  The Stipulation resolved many, but not all, of the disputes among the parties.

The issue before the Court is whether Passumpsic Savings Bank is entitled to the four cash reserves due to Passumpsic's valid, perfected, and enforceable prepetition security interest in inventory and accounts receivable owned by Debtors as of the petition date and its valid, perfected, and enforceable post-petition replacement liens, or whether the reserves should be distributed in accordance with the terms of the Stipulation.

This Court has authority to exercise jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1334, 157(a), and U.S. District Court for the District of New Hampshire Local Rule 77.4(a).  This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II.  BACKGROUND

On June 22, 2011, Isaacson Steel, Inc. and Isaacson Structural Steel, Inc. filed voluntary petitions for protection under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  (Doc. No. 1).  The Debtors continue to operate as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.  On June 30, 2011, the U.S. Trustee appointed the Official Committee of Unsecured Creditors. (Doc. No. 3).  On July 8, 2011, the Court entered an order granting Debtors' motion for joint administration of the cases.  (Doc. No. 33).

The Debtors are corporations that were engaged in the business of steel fabrication in Berlin, New Hampshire.  As of the bankruptcy filing, the Debtors' principal secured creditor was Passumpsic Savings Bank, which held senior secured prepetition claims arising from money loaned and secured by a series of loan agreements, promissory notes, mortgages, and security agreements which were cross-collateralized between the two Debtors.[1]  The parties in this matter have stipulated that, for the purposes of determining appropriate distribution of the Cash Reserves, Passumpsic had a valid, perfected, and enforceable prepetition security interest in inventory and accounts receivable owned by Debtors as of the petition date.[2]

_____

[1] See Proof of Claim 42-1, Case No. 11-12415.

[2] Post-Trial Mem. of New Hampshire Business Finance Authority at 5 & n.1 (Doc. No. 933) ("For the purposes of the November 27, 2012 hearing, it was agreed that Passumpsic had a valid, perfected and enforceable pre-petition security interest in inventory and accounts receivable owned by Debtors on the date of filing.") (hereinafter BFA Post-Trial Memo.).

The Court authorized the Debtors' use of Passumpsic's cash collateral through a series of cash collateral orders, the terms of which were negotiated between Debtors and Passumpsic, following Passumpsic's initial objection to Debtors' use of its cash collateral.  See Exs. 101, 103, 105, 106 (collectively, the "Cash Collateral Orders").  The Cash Collateral Orders provided that:

> [P]ursuant to Sections 361 and 363(e) of the Bankruptcy Code, and for purposes of section 507(b) of the Bankruptcy Code, as adequate protection to Passumpsic for the Debtor's use of Cash Collateral, Passumpsic is hereby granted replacement liens in all post-petition property of the estate of the same type against which Passumpsic held validly-perfected security interests as of the Petition Date . . . . The Replacement Liens shall maintain the same priority, validity, and enforceability as such liens on the Cash Collateral, but shall be recognized only to the extent of any diminution in the value of the collateral resulting from the use of Cash Collateral pursuant to this Order.

Ex. 101 at 3-4.  The parties have further stipulated that, for the purposes of the evidentiary hearing, Passumpsic had a valid replacement lien on Debtors' after-acquired inventory and accounts receivable, as part of the Cash Collateral Orders that provided Passumpsic with adequate protection from diminution of value from use of Passumpsic's prepetition collateral. BFA Post-Trial Memo. at 5-6.

Although the Debtors were authorized to use cash collateral, they still needed additional funding during the pendency of the bankruptcy.  Failing to procure unsecured financing, they entered into a secured lending agreement with BFA.  On December 1, 2011, the Court entered an order approving the Working Capital Financing Arrangement with BFA.  Ex. 107.  The Order authorized the Debtors to obtain postpetition financing from BFA in the maximum amount of $2,250,000, pursuant to the terms of the Limited Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement (BFA Loan Agreement).  Ex. 107 ¶ 8 (referencing Ex. 108).

As a precondition to the receipt of funds from BFA, the Debtors granted BFA, with

respect to its loan:

> (a) "A first priority security interest in accounts receivable and inventory acquired or generated with respect to contracts entered into on or after October 1, 2011";
> (b) a first priority security interest in accounts receivable arising under the Liberty Mutual contracts and the Middletown School Contracts, junior only to any valid recoupment or setoff of Turner Construction Co., Inc.;
> (c) a first priority security interest in the Debtors' or Estates' commercial tort claims; and
> (d) "Proceeds and products of all of the foregoing, including cash deposits in any bank accounts maintained by [Debtors], that constitute proceeds of property which is subject to a security interest held by BFA, excluding any cash deposits that constitute proceeds of the Debtor's tax refunds, but including, without limitation, all "cash collateral," . . . in which [BFA] has a lien, security interest, or other interest . . . in each case whether existing on the Petition Date, arising pursuant to the Final Order, or otherwise."

Ex. 107 ¶¶ 5(a)-(d).  The BFA Working Capital Financing Arrangement provides that the BFA

liens shall:

> have all of the lien priority benefits afforded to valid perfected, and enforceable first priority security interests by the New Hampshire Uniform Commercial Code (the "UCC"). Including, without limitation, RSA 382-A:9-324 which permits purchase money security interests to become senior to previously perfected security interests in and to the same collateral[; and]
> be deemed fully perfected, within the meaning of the UCC, and shall be deemed for all purposes to be perfected first priority, purchase money liens on the BFA Collateral without giving Passumpsic Savings or any other secured creditor of record any further notice of BFA's intention to finance the new contracts and acquire automatically liens in, to and on the inventory purchased by Debtor to fulfill such contracts, the general intangibles and accounts arising therefrom . . . .  The BFA liens granted to BFA by the Debtor and as authorized pursuant to this Order shall be valid, enforceable, perfected and senior to any competing liens held by Passumpsic Savings or any other secured creditor of record.

Id. ¶¶ 11-12; see also Ex. 108 § 1.04.  The BFA Loan Agreement further delineates the nature of

the BFA Collateral, and states that: "For purposes of clarifying the [BFA Collateral description],

it is understood that . . . [BFA] shall not have any interest in any "cash collateral" that reflects collateral for the [Debtors'] obligations to Passumpsic." Ex. 108 ¶ (3).

On February 29, 2012, Debtors sold substantially all of their real and personal property pursuant to this Court's Order dated February 1, 2012.  Ex. 213.  That Order provided that:

> Passumpsic Savings Bank is hereby granted relief from the automatic stay under Section 362 of the Bankruptcy Code, authorizing it to take possession of an liquidate its security interests in the Debtors [sic] accounts, accounts receivable (and the cash and non-cash proceeds thereof), and in any and all cash on hand and/or otherwise standing in the Debtor's name.  Upon the Court's execution of this Order, the Debtor shall immediately surrender and turn over to Passumpsic Savings Bank, all of the Debtor's accounts, accounts receivable, all cash (net of agreed-upon wind-down/closing expenses, which are estimated to be $5,000).

Ex. 213 ¶ 60.

After the sale of the Debtors' assets, the instant disputes arose with respect to entitlement to certain cash and other assets, such as accounts receivable, that had been reserved by the Debtors or that remained in the estates after the Debtors completed the sale and wound down operations.  Turner, the BFA, and Passumpsic agree that the Debtors are not entitled to the ending cash.  Beyond that basic agreement, however, their positions diverge.

On January 12, 2012, Turner filed a Motion to Approve Wind Down Budget.  The BFA and Passumpsic both filed objections to the Motion to Approve Wind Down Budget.  Per the Court's order on March 27, 2012, the parties submitted a stipulation on agreed facts about the allocation of the wind down budget on June 23, 2012 (Stipulation of Facts with Respect to Disputes Concerning Allocation of the Debtor's Reserve Account, Cash, and Other Property of the Estate, Doc. No. 863 (the "Factual Stipulation")).

The Debtors, Turner, and the BFA entered into a Stipulation of Settlement on October 22, 2012.  (Doc. No. 894).  The Stipulation represents an agreement reached among the Debtors, Turner, and the BFA as to the distribution of the Debtors' ending cash, and, according to the parties, "substantially simplifies the legal and factual disputes with respect to such reserved cash." (Doc. No. 895).  The BFA further explains that each of the parties to the Stipulation had a bona fide claim to the ending cash, but allocation of the monies was complicated by, *inter alia*, the difficulty in tracing the cash and allocation of expense issues.  BFA Post-Hearing Mem. at 4.  After a hearing, the Court overruled Passumpsic's objection and approved the Stipulation, finding that the proposed reserved amounts served as adequate protection of Passumpsic's interests until such time as the Court determined which party was entitled to the reserves.  See Stipulation Order, ECF No. 935.

The Stipulation provides that "the balance of Ending Cash on hand after setting aside the [Cash Reserves] shall be paid to the BFA and Turner as follows: fifty-two percent (52%) to the BFA and forty-eight percent (48%) to Turner.  Upon the collection of any additional Ending Cash, such Ending Cash shall be paid to the BFA and Turner in the same portions, [and] all of ISI's Ending Cash shall be paid to the BFA."   Stip. of Settlement ¶ 2.

The Stipulation and the Stipulation Order  established the following four funds made up of the Debtors' ending cash, encumbered by the (disputed) liens of Passumpsic:

1.      A fund consisting of the proceeds of accounts receivable held by special counsel for the Debtors and collected from an account on behalf of the Barry Lundeville Note Payments ("Lundeville Note Proceeds");

2.      A sum of $21,079 constituting the Ending Cash of ISI ("ISI Ending Cash");

3.  A fund of $39,096.86, consisting of 50% of the proceeds of the sale of inventory purchased by the Debtors to fulfill the "Hilton Contract", a contract that was cancelled prepetition after the inventory for the contract was purchased and partially processed by the Debtors ("Hilton Inventory Fund"); and

4.  A fund of $60,000, consisting of an escrow account held by special counsel that was set aside in a segregated account and held to satisfy a claim of Passumpsic that it should be reimbursed for its earlier payment of real estate tax obligations incurred by the Debtors during the pendency of the bankruptcy ("Real Estate Tax Escrow").

The evidentiary hearing on the Cash Reserves was held November 27, 2012.  At the hearing, the parties stipulated to the admission of BFA's exhibits 101-108 and Passumpsic's exhibits 201-216.  The Court heard testimony from Robert Wexler ("Wexler"), a financial advisor to the Debtors, and from Robert Bishop ("Bishop"), an employee of Passumpsic who is familiar with ISSI.  After testimony, the parties submitted final closing arguments in writing and the Court took the matter under submission.

## III. DISCUSSION

The current disputes involve competing interests over the following assets: (1) the Lundeville Note Proceeds; (2) the ISI Ending Cash, i.e., the remaining proceeds of the sale of ISI's assets after the payment of its final expenses; (3) the Hilton Inventory Fund, i.e., the proceeds of the sale of the Hilton Inventory; and (4) the Real Estate Tax Escrow.

"An entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest."  11 U.S.C. § 362(p)(2).  Parties claiming an interest

8

in proceeds of a sale of a debtor's assets have the burden of showing an interest by a preponderance of the evidence.  In re McLaughlin, 2011 BNH 005 (Bankr. D.N.H. 2011) (citing § 363(p)(2)); Grogan v. Garner, 498 U.S. 287, 286 (1991)).

To determine whether the Cash Reserves properly belong to Passumpsic or should be distributed pursuant to the agreement in the Stipulation, the Court must first address whether BFA and Passumpsic have sufficiently established their interest in the reserve amounts.  If the Court finds that both parties have met their burden to show, by a preponderance of the evidence, the extent, validity, and priority of their interests, the Court may then take each reserve amount individually and ascertain the source of each of the funds.  Once the funds' sources are identified, the Court may then evaluate the BFA and Passumpsic's claims to the amounts under the various agreements each have entered into with the Debtors.  After the hearing on November 27, 2012, the Court requested the parties delineate their arguments as to which entity had the burden of proof for each reserve.

The parties have stipulated that, for the purposes of the evidentiary hearing, Passumpsic had a valid, perfected, and enforceable prepetition security interest in inventory and accounts receivable owned by Debtors as of the petition date.  Further, they stipulated that for the purposes of the evidentiary hearing, Passumpsic had a valid replacement lien on Debtors' after-acquired inventory and accounts receivable, as part of the Cash Collateral Orders that provided Passumpsic with adequate protection from diminution of value from use of Passumpsic's prepetition collateral.  No arguments have been raised to dispute the BFA's claim that it has a valid, perfected, and enforceable senior security interest in accounts receivable and inventory acquired or generated with respect to contracts entered into on or after October 1, 2011, and the

9

proceeds of those accounts receivable and/or inventory. Thus, the burden on both parties is limited to establishing whether the reserve amounts are from (1) proceeds of prepetition inventory or accounts receivable, or property subject to Passumpsic's prepetition liens or replacement liens; (2) proceeds of inventory or accounts receivable from contracts entered into after October 1, 2011; or (3) have been otherwise reserved, held back, or escrowed on behalf of either the BFA or Passumpsic.

The BFA, in its Post-Trial Memorandum, argues that Passumpsic has the burden of proof to show its claim to each of the three funds that remain in dispute. In support of its position, the BFA argues that Passumpsic's position can best be described as a secured creditor "claiming a lien on assets of a Chapter 11 estate and claiming entitlement to the disbursement of those assets," BFA Post-Trial Mem. at 5, and therefore contends that Passumpsic has the burden of proving the validity, perfection, and enforceability of its claimed lien. Id. (citing In re Panther Mount. Land Dev., LLC, 438 B.R. 169, 193-94 (Bankr. E.D. Ark. 2010)). The BFA's argument analogizes Passumpsic to a secured creditor seeking relief from the automatic stay.

At the Evidentiary Hearing, the BFA also argued that the entry of the Stipulation Order changed the nature of the proceedings in part, because in that Order the Court established how the majority of the ending cash was to be distributed, but for the three "pots"- and that has now shifted the burden from both parties to Passumpsic. The BFA relies on the argument that if Passumpsic cannot show that the money is traceable to its collateral, then the reserved funds revert to the distribution under the Stipulation.

Passumpsic disagrees, and argues that the BFA needs to show that the Cash Reserves are BFA's collateral, because if BFA is going to rely on its financing agreement, then it needs to

show that the monies are its cash collateral or proceeds thereof.  Passumpsic also argues that the BFA has the burden of proof with respect to each reserve amount but contends that there are different burdens for each of the reserves.

### A.  Lundeville Note Proceeds

In the Factual Stipulation, the Parties list as a Pending Receipt as of May 31, 2012, payments on behalf of a Note from Barry Lundeville. Ex. A, Factual Stipulation (listing a total receivable of $16,688, for nineteen note payments at $878.30 per month starting May 1, 2012). At the Evidentiary Hearing, the BFA conceded that the Lundeville Note reserve should be distributed to Passumpsic.  There being no dispute as to the distribution of the Lundeville Note reserve, the Lundeville Note Proceeds reserve shall be distributed to Passumpsic.

### B. ISI Ending Cash

The Stipulation Order provided for the creation of a reserve fund of $21,519.00 of the funds held by ISI after the sale was complete (the "ISI Ending Cash").  Stip. Order ¶ 3.  For the purposes of that Order, the Court determined that Passumpsic's claim to the ISI Ending Cash was disputed by the parties, but, despite the BFA's argument that it was entitled to the ISI Ending Cash by the terms of the BFA Financing Agreement, Passumpsic was entitled to adequate protection.  Id.

After the sale was completed on February 29, 2012, the Debtors wound up their businesses.  The funds with which to do so came from a hold back of the funds designated to be transferred to Passumpsic.  The ISI Sale Order contemplated wind down expenses of $5,000.  Ex. 213.  As of February 9, 2012, ISI's final expense report shows wind down expenses of

11

$52,264, Ex. 209, which Wexler testified is the final amount of expenses.  The final expenses
were not paid for by Turner's post-petition funding, Ex. 201 at 3, but from ISI's cash.  The ISI
Ending Cash has been held in a Citizens Bank DIP account, and reflected the following balances
for the first four months of 2012:

| | |
|---|---|
| January 31, 2012 | $74,986 |
| February 29, 2012 | $60,144 |
| March 31, 2012 | $32,130 |
| April 30, 2012 | $21,079 |

See  Monthly Operating Report of ISI, Doc. No. 664; Monthly Operating Report of ISI, Doc. No.
783; Monthly Operating Report of ISI, Doc. No. 813.[3]

 Wexler testified that he held back approximately $52,000 of the sale proceeds for the
payment of wind down expenses.  Currently, the balance of the ISI Ending Cash is
approximately $21,000, which represents the cash as of the sale date, plus any post-sale
collection of receivables, less the money wired to Passumpsic per the Sale Order, and less the
expenses paid as wind down costs.  Wexler testified that the actual amount disbursed for wind
down expenses was approximately $31,000, which, when taken from the $52,000 held back,
leaves the remaining ISI Ending Cash of about $21,000, the subject of the dispute.

 Passumpsic argues that since there is a final, non-appealable order of the Court, it is the
BFA's burden to show that: it has a claim to the ISI Ending Cash; its claim has priority over
Passumpsic's claim; and its claim is not impaired by the ISI Sale Order.  Passumpsic Closing

---

[3] In April 2013, the Debtors refiled their Monthly Operating Reports due to a technical defect in
the originally-filed reports.  The original reports and amended reports are substantively similar.

Mem. ¶ 9.  Passumpsic argued at the hearing, and the BFA agreed, that the BFA has no claim to ISI's assets, and therefore, the BFA has no interest in the ISI Ending Cash.

The BFA argues Passumpsic failed to meet its burden of proof because the evidence presented at the evidentiary hearing did not "reconcile" the terms of the Sale Order with the current status of the Ending Cash and because there is nothing in the record to show whether the terms of the Sale Order were completely fulfilled and an additional receivable was put in the account.  That lack of clarity, the BFA contends, demonstrates Passumpsic failed to meet its burden of proof, and, therefore, the ISI Ending Cash reserved pursuant to the Stipulation Order should be distributed to Turner and the BFA in the ratio prescribed by the Stipulation.

However, at the hearing the BFA conceded that it never was granted a lien on ISI's assets, only on the assets belonging to ISSI.  Further, the BFA stated that "there was an opportunity to simplify the issue" because the reason for the reservation of rights with respect to the ISI Ending Cash was a claim of the Debtor to that amount, not the BFA.[4]  The BFA stated that it would not be claiming an interest in the ISI Ending Cash unless the Debtors had not spent all that was allocated to them under the Sale Order, i.e., unless the Debtors had spent less than $5,000 in wind down expenses.

The Court is unconvinced by the BFA's arguments.  Wexler testified that the $21,000 is money that, but for the projected winddown expenses and Wexler's decision to hold back $52,000 from the proceeds of the sale, would have been distributed to Passumpsic under the terms of the Sale Order.  The record shows that, once ISI was not operating, it simply processed

_____

[4] At that point, the BFA stated that perhaps the best interpretation of the language in the Sale Order was that Passumpsic should receive $16,000 of the ISI Ending Cash, leaving $5,000 in the account for potential expenses.

13

receivables, sent money to Passumpsic under the terms of the Sale Order (holding back money to pay the projected expenses), and paid those expenses out of its ending cash. The Court can find no reason why the ISI Ending Cash should not be distributed under the terms of the Sale Order. Therefore, the Court finds that the ISI Ending Cash, as defined in the Stipulation Order and reserved pursuant thereto, shall be distributed to Passumpsic.

### C. Inventory Reserve

The Hilton contract was a prepetition contract for ISSI to fabricate structural steel components for the construction of a Hilton Garden hotel in Amherst, Massachusetts. The parties, as well as Wexler and Bishop, have represented that the contract was cancelled prepetition. The steel inventory intended to be used pursuant to this contract had already been purchased at the time the contract was cancelled, and there was no other use for the steel than scrap. ISSI had to liquidate the assets in order to recoup any of the expense. At the Evidentiary Hearing, the BFA conceded that Passumpsic had a prepetition lien that would have attached to the Hilton Inventory Reserve had those funds existed prepetition.

Bishop testified that postpetition, ISSI had a potential buyer for the steel, and wanted to generate some cash, so ISSI proposed selling the Hilton Inventory to the buyer for approximately $78,000 and splitting the proceeds 50% to the Debtors, 50% to Passumpsic. Bishop testified that the contract with Hilton was entered into prepetition and "almost certainly" terminated prepetition. He further testified that he was not aware of the exact amount of inventory that was purchased nor whether there were additional purchases of steel postpetition.

Wexler testified that the Hilton Scrap Inventory was liquidated in November of 2012 and resulted in two payments to ISSI that month, totaling $78,193.73. He further testified that on

14

November 22, 2012, he transferred the funds that were internally coded as the proceeds of the Hilton Inventory sale to the ISSI Citizens Bank DIP money market account. <u>See also</u> Ex. 211 at 5 (showing the transfer into the money market account), and Ex. 211 at 20 (showing a transfer to a Citizens Bank account in the amount of $78,193.73).

Passumpsic argues that the inventory, and therefore the proceeds from the sale of the inventory, constitute its cash collateral because the contract with Hilton was entered into prepetition.  Indeed, it argues, the contract was breached prepetition.  Passumpsic argues that ISSI offered to broker the deal to sell Passumpsic's collateral, for a fee of 50% of the proceeds of the sale.[5]

The BFA argues that if there was a deal between Passumpsic and the Debtor, that deal was not brought before the Court and therefore should not carry any weight.  It also contends that unless Passumpsic can demonstrate that, at the time the inventory was purchased, Passumpsic had a valid security interest that attached to the inventory, then the proceeds of the liquidation of the Hilton Inventory should be distributed pursuant to the Stipulation Order's terms.

11 U.S.C. §§ 361 provides that "where adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity of property, such adequate protection may be provided by–providing to such entity an additional or replacement lien to the extent that such

---

[5]  Passumpsic argues that the agreement of the parties for the Debtors to sell the steel inventory created a constructive trust, and that although the proceeds of the sale were commingled with other amounts in the ISSI reserve account, the balance of the ISSI reserve account continuously and consistently remained above $39,097, and, therefore, Passumpsic is entitled to a return of the entire amount of the funds, or $39,097. The Court finds that it does not need to reach the constructive trust argument.

stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such

property . . ." § 361(2); accord Baybank-Middlesex v. Ralar Distribs. (In re Ralar Distribs., Inc.),

182 B.R. 81, 85 (D. Mass. 1995).  One form of adequate protection for prepetition floating

lienholders is to continue the lien on accounts or inventory acquired after commencement of the

case as long as it is clear from the facts that this will provide adequate protection but not a

windfall–essentially using replacement liens to avoid the difficulties of tracing proceeds of

prepetition collateral. 3 Collier on Bankruptcy ¶ 361.03[3] (Alan N. Resnick & Henry J. Sommer

eds. 16th ed.)(citing Ralar Distribs.).

  The Court finds that the relevant question is not whether the agreement between the

parties created a constructive trust, but whether the proceeds from the sale of the Hilton Scrap

Inventory constituted proceeds of Passumpsic's collateral subject to its prepetition lien or the

replacement lien granted in the Cash Collateral Orders.  Here, according to Wexler and Bishop's

testimony, the Hilton Scrap Inventory was initially purchased prepetition on account of a

prepetition contract.  As of the petition date, Passumpsic held a senior secured liens on all assets

of the Debtors including the steel that made up the Hilton Scrap Inventory.  Postpetition, the

steel was sold, and Wexler transferred the proceeds to the ISSI Citizens Bank DIP money market

account on November 22, 2012.  Since the inventory existed prepetition and as of the Petition

Date, it was Passumpsic's collateral.  Passumpsic was granted a replacement lien on the proceeds

of its collateral in the Cash Collateral Orders.  Since the proceeds can easily be traced to the sale

of the Hilton Scrap Inventory, there is no additional windfall to Passumpsic.  Further, the BFA

has no claim to the Inventory Reserve, because its lien only extends to assets acquired

postpetition that would not have been acquired but for the cash obtained from the BFA.  The

Court finds that the Inventory Reserve constitutes proceeds of Passumpsic's prepetition collateral, and therefore the Inventory Reserve is subject to Passumpsic's replacement liens and shall be distributed to Passumpsic.

### D. Real Estate Tax Escrow

The final reserve fund that the Court must address is the Real Estate Tax Escrow. Passumpsic asserts a claim to $60,000 of the Debtors' reserve accounts as "reimbursement for post-petition property taxes paid out of the proceeds from the Sale." Passumpsic Mem. in Support ¶ 6. As of May 31, 2012, ISSI had put into an escrow account $60,000 as the so-called "ISSI Real Estate Account." Factual Stip. ex A. The total amount of tax liability on account of postpetition property taxes was $53,438. Ex. 206.

When the Debtors' assets were sold, Passumpsic had the first mortgage on the real estate. At the time the sale closed, there were accrued real estate taxes that needed to be paid, so those taxes were paid from the proceeds of the sale. However, some of the accrued tax obligation was due to post-petition real estate taxes. At the evidentiary hearing, the parties represented that the crux of the issue is where the escrowed funds originally came from. The parties agree that the escrowed amount was transferred from a Citizens Bank DIP Money Market Account to Orr & Reno, Special Counsel to the Debtors. The dispute between the parties is whether the funds in the Citizens Money Market Account were, as BFA contends, entirely its cash collateral or proceeds thereof, or, as Passumpsic contends, that the funds in that account represented commingled funds from several sources.

At the evidentiary hearing, Wexler testified that he reserved funds to put into an "earmarked" account to pay real estate taxes. Postpetition, he testified, there was a reservation

17

for real estate taxes in the wind down budget of $45,000.  Based off of the Debtors' historical

taxes through 2011, he revised that figure upward to $60,000.  During cross-examination,

Wexler did state that he disbursed funds for real estate tax payments approximately three to four

weeks after the Sale, with the understanding that Passumpsic had paid the pre- and postpetition

taxes.  He stated that since there was no true earmarking other than an internal coding within his

system, for disbursement purposes, it is not possible to determine the original source (ISI or

ISSI) for the funds in the Real Estate Tax Escrow.  He also testified that, in his opinion as the

person who handled the financial accounts for ISSI, "it is fair to say" that the funds for the

escrow came from either proceeds of Turner accounts receivable or BFA loan proceeds, at least

in part.  Wexler testified that he estimated that ISSI's assets after the sale was approximately

$1.7 million, including approximately $650,000 of BFA collateral, $800,000 of Turner's

collateral, and $250,000 from other sources.  Since, he testified, the ending balance in December

2011 was only $125,000, approximately $1.6 million was spent on general expenses, including

the earmarking for the Real Estate Tax Escrow, but Wexler could not prove that any specific

dollar was from a particular source.

Passumpsic argues that the obligation to pay post-petition taxes belongs to the Debtors

and should have been paid out of cash collateral.  The Debtors' failure to pay tax obligations, it

argues, does not mean that the taxes should come out of proceeds that were supposed to go to

Passumpsic under the terms of the Sale Order.  Passumpsic believes it is entitled to the funds in

the Real Estate Tax reserve for four reasons. First, it argues, the ISSI reserve account, from

which the escrow was created, was not solely BFA's cash collateral, but rather a mixture of

several sources of cash collateral and proceeds. Second, the equities of the case require that the

burden of paying real estate taxes be borne by all creditors, not just Passumpsic, citing to the Winding Down Proviso of LBR 4001(d).  Third, the accrual of real estate taxes during the bankruptcy resulted in a diminution of value of Passumpsic's collateral, against which it was not adequately protected, so therefore Passumpsic is entitled to superpriority status under § 507(b), and should be reimbursed out of the Real Estate Tax Escrow. And fourth, pursuant to the doctrine of equitable subrogation, Passumpsic should be subrogated to the priority status of the City of Berlin.

With respect to the winding down proviso, Passumpsic argues that the equities should be borne by all of the creditors because the post-petition property taxes were a necessary[6] cost of the Debtor's post-petition operations, and all of the creditors benefitted because the continued operations brought additional funds into the estate to be distributed to the creditors.  Passumpsic also argues that it should receive the Real Estate Tax Escrow because the accrual of postpetition real estate tax liability resulted in an erosion of the value of Passumpsic's collateral against which Passumpsic was not adequately protected.  In support of that argument, Passumpsic states that during the pendency of the case, Debtors continued to use Passumpsic's real estate collateral. The continued use led to the accrual of real estate tax liability, and, Passumpsic argues, the diminution of its collateral.  Passumpsic also argues that the payment of the real estate taxes was an actual and necessary cost of preserving the estate giving rise to an administrative claim in favor of Passumpsic, which should be entitled to super-priority under 11 U.S.C. § 507(b).

---

[6] Passumpsic cites to 11 U.S.C. § 1112(b)(4)(I), arguing that since failure to pay taxes constitutes "cause" for dismissal or conversion, the taxes were a necessary expense.

19

Finally, Passumpsic argues that it is entitled to receive the Real Estate Tax Escrow under the doctrine of equitable subrogation, because the City of Berlin's claim for post-petition taxes would have been entitled to priority status if the taxes had not been paid out of the sale proceeds that would have otherwise been turned over to Passumpsic.

The BFA argues that the only relevant question since the Stipulation went into effect, is whether Passumpsic can show that the funds escrowed on behalf of the taxes came from either its original collateral or its replacement collateral, and if it cannot, the money reverts to the treatment under the Stipulation Order.  The BFA contends, essentially, that the fault of the Debtors in not paying postpetition tax obligations does not translate into Passumpsic being compensated with the funds left over, unless Passumpsic can show that those funds are its collateral or proceeds thereof.  At most, the BFA states that Passumpsic may have an administrative claim with respect to its payment of the real estate taxes.

Section 503(b)(1)(A) provides for administrative expenses, including "the actual, necessary costs and expenses of preserving the estate . . . ."  § 503(b)(1)(A).  Section 503(b)(1)(B) provides that: "there shall be allowed administrative expenses . . . including (B) any tax (i) incurred by the estate, whether secured or unsecured, including property taxes for which liability is in rem, in personam, or both, except a tax of a kind specified in section 507(a)(8) of this title . . . ."  §503(b)(1)(B).[7]

Where a creditor has paid taxes incurred by a debtor in order to facilitate a sale of debtor's assets, courts have granted the creditor an administrative claim under § 503(b)(1)(A) as

---

[7] Section 507(a)(8) includes, in relevant part, "a property tax incurred before the commencement of the case and last payable without penalty after one year before the date of the filing of the petition." § 507(a)(8)(B).  Here, the parties have stipulated that the property taxes at issue are post-petition, and thus §507(a)(8) does not apply.

a necessary cost of preserving the estate.  See, e.g., In re Pub Dennis of Cumberland, Inc., 142

B.R. 38, 41 (Bankr. D.R.I. 1992).  In Pub Dennis, the court found the payment of unpaid

prepetition property taxes related to the debtor's liquor license by a purchaser was a necessary

expense for the preservation of the debtor's estate because without the payment, the liquor

license may not have been able to have been sold.  Id. at 41 (finding that even though the

prepetition tax liability would not have been entitled to administrative expense priority under

§ 503(b)(1)(B), because the payments were necessary expenses that was sufficient to entitle the

purchaser to an administrative expense claim).

       Further, there is no limitation on which entity can request payment of an administrative

expense under §503.  Section 503(a) provides that a request for an administrative expense may

be made by "an entity."  There is no indication that only the taxing authority may request the

administrative expense under § 503(b)(1)(B).  The limitation in that section is that the taxes must

be incurred postpetition by the estate.  See Salem v. Mailman Steam Carpet Cleaning, Inc. (In re

Mailman Steam Carpet Cleaning, Inc.), 270 B.R. 82, 87 & n.11 (B.A.P. 1st Cir. 2001).

       The Court finds that to the extent Passumpsic advanced taxes on behalf of the Debtors'

postpetition real estate tax obligations, Passumpsic is entitled to an administrative claim under

§ 503(b)(1)(A) & (B).  Passumpsic's payment of the postpetition real estate taxes served to

preserve the value of the estates prior to the sale in February 2012.  Further, as real property

taxes accrued postpetition, Passumpsic's claim diminished in value, since as a first priority

secured claim under New Hampshire law, the real estate taxes would need to be paid ahead of

Passumpsic's secured claim.  BFA's argument that payment of the postpetition tax liability is not

entitled to repayment out of an escrow set aside specifically for real estate property taxes is

unconvincing.  Since the Real Estate Tax Escrow was earmarked for the payment of postpetition

taxes, it is appropriate to use those funds to pay Passumpsic's administrative claim for such

taxes.  Thus, the Court finds that $53,438 of the Real Estate Tax Escrow shall be distributed to

Passumpsic in satisfaction of its administrative claim.

After Passumpsic's administrative claim is satisfied, $6,562 remains in the $60,000 Real

Estate Tax Escrow.  In order to determine the appropriate disbursement of the remaining

escrowed funds, the Court attempted to determine the proportionate tax liability of each Debtor.

However, the record before the Court does not permit a direct determination of the real estate tax

liabilities.  The Debtors operated a unitary business on the real estate.  The parties did not

submitted sufficient evidence to support any definitive determination of the source of the funds

in the Real Estate Tax Escrow, let alone the remaining $6,562.  Some of it may have come from

ISI Ending Cash, in which case the funds would be Passumpsic's cash collateral.  Some of it may

have come from proceeds of the BFA's postpetition loan.  During the Evidentiary Hearing,

Wexler testified that, despite his internal earmarking of the funds to be escrowed to pay

postpetition real estate taxes, he could not state with confidence the source of the Real Estate

Tax Escrow.

Therefore, in the absence of evidence as to the source of the funds, the Court will allocate

the balance in the Real Estate Tax Escrow with the information available in the record.  An

appropriate allocation of the remaining tax escrow proceeds would be based on the relative use

and benefit that each debtor received from its use of the real property during the period between

the Petition Date and the sale of the Debtors' assets (the "Use Period").  Using the Debtors' filed

Monthly Operating Reports for June 2011 to February 2012[8], the Court determined the gross

billings for each of ISI and ISSI during each month.  Those gross billings provide an appropriate

basis to measure the use of the property and the benefit received by each debtor through

utilization of the facilities, and their respective share of each.[9]  The result of the Court's analysis

appears in the table below.

| Month | ISI Gross | ISSI Gross | Total Gross Billings | ISI Percentage | ISSI Percentage |
|-------|-----------|------------|----------------------|----------------|-----------------|
| June 2011 | $116,224 | $1,029,986 | $1,146,210 | 10.14% | 89.86% |
| July 2011 | $261,663 | $939,793 | $1,201,456 | 21.78% | 78.22% |
| Aug. 2011 | $275,320 | $689,793 | $964,329 | 28.55% | 71.45% |
| Sept. 2011 | $298,858 | $1,588,427 | $1,887,285 | 15.84% | 84.16% |
| Oct. 2011 | $306,226 | $1,991,725 | $2,297,951 | 13.33% | 86.67% |
| Nov. 2011 | $246,467 | $2,248,053 | $2,494,520 | 9.88% | 90.12% |
| Dec. 2011 | $211,940 | $3,746,787 | $3,958,727 | 5.35% | 94.65% |
| Jan. 2012 | $221,920 | $3,433,919 | $3,655,839 | 6.07% | 93.93% |
| Feb. 2012 | $0 | $20,953 | $20,953 | 0% | 100% |
| Total | $1,938,618 | $15,688,652 | $17,627,270 | 12.33% | 87.67% |

Based on the gross billings during the Use Period, as reported in the Monthly Operating

Reports filed by the Debtors, ISI's operations accounted for approximately 12.33% of the

Debtors' billings during the Use Period, and ISSI's operations accounted for approximately

---

[8] The Voluntary Petitions were filed June 22, 2011, and the Debtors conducted an auction of assets and ceased operation on February 29, 2012.

[9] The Court is not taking judicial notice of the accuracy of the Monthly Operating Reports or the data contained therein.  It is just using the reported numbers as a basis for the ratio created solely for allocation purposes.

87.67% of the Debtors' billings.  Thus, the Court determines that ISI received approximately

12.33% of the postpetition benefit from the use of the real property that incurred the real estate

taxes for which the Real Estate Tax Escrow was earmarked, and ISSI received approximately

87.67% of the benefit.[10]   Applying those percentages to the funds remaining in the Real Estate

Tax Escrow after Passumpsic's administrative claim is distributed, the Court finds that $808.84

of the remaining funds are allocable to ISI and the balance, $5,753.16, allocated to ISSI.

     As all of ISI's Ending Cash is subject to Passumpsic's lien and must be distributed to

Passumpsic under the terms of the Sale Order (see Section III.B, supra).  Therefore, $808.84

shall be distributed to Passumpsic, representing ISI's portion of the remaining escrowed funds.

And as ISSI's assets are subject to the Stipulation's division of assets, its allocation of

$5,753.16 shall be distributed as set forth in the Stipulation.


## IV.  CONCLUSION

     For the reasons set forth in this opinion, the Court concludes that:

     (1) The Lundeville Note Proceeds shall be distributed to Passumpsic;

     (2) The ISI Ending Cash shall be distributed to Passumpsic;

---

[10] For the sources of the data, see Debtor-in-Possession Monthly Operating Report for Debtor Isaacson Steel, Inc. for the periods: June 23, 2011 to June 30, 2011 (Doc. No. 264 at 7); July 1, 2011 to July 31, 2011 (Doc. No. 265 at 8); August 1, 2011 to August 31, 2011 (Doc. No. 266 at 8); September 1, 2011 to September 30, 2011 (Doc. No. 330 at 7); October 1 to October 31, 2011 (Doc. No. 416 at 7); November 1, 2011 to November 30, 2011 (ECF No. 488 at 8); December 1, 2011 to December 31, 2011 (Doc. No. 581 at 8); January 1, 2012 to January 31, 2012 (Doc. No. 664 at 7); and February 1, 2012 to February 29, 2012 (Doc. No. 783 at 5); and Debtor-in-Possession Monthly Operating Report for Debtor Isaacson Structural Steel, Inc. for the periods: June 23, 2011 to June 30, 2011 (Doc. No. 267 at 7); July 1, 2011 to July 31, 2011 (Doc. No. 268 at 8); August 1, 2011 to August 31, 2011 (Doc. No. 269 at 10); September 1, 2011 to September 30, 2011 (Doc. No. 331 at 11); October 1 to October 31, 2011 (Doc. No. 417 at 11); November 1, 2011 to November 30, 2011 (Doc. No. 489 at 10); December 1, 2011 to December 31, 2011 (Doc. No. 582 at 11); January 1, 2012 to January 31, 2012 (ECF No. 665 at 10); and February 1, 2012 to February 29, 2012 (Doc. No. 784 at 6).

(3) The Hilton Inventory Reserve shall be distributed to Passumpsic;

(4) Passumpsic has an allowed administrative expense of $53,438, to be distributed from the Real Estate Escrow on account of Passumpsic's payment of postpetition real estate taxes;

(5) The remaining funds in the Real Estate Escrow shall be divided between Passumpsic and the parties to the Stipulation as follows: $808.84 to Passumpsic and $5,753.16 to the parties to the Stipulation.


This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate order consistent with this opinion.

ENTERED at Manchester, New Hampshire.


Date:   September 19, 2013                    /s/ J. Michael Deasy
                                              J. Michael Deasy
                                              Bankruptcy Judge